EWA PLANTATION COMPANY v. CHARLES T. WILDER, TAX ASSESSOR FOR THE FIRST TAXATION DIVISION, TERRITORY OF HAWAII.

No. 1327.

HAWAIIAN SUGAR COMPANY v. CHARLES T. WILDER, TAX ASSESSOR FOR THE FIRST TAXATION DIVISION, TERRITORY OF HAWAII.

No. 1328.

Submissions Upon Agreed Statements of Fact.

Argued January 24, 25, 1922.          Decided February 28, 1922.

Coke, C. J., Kemp. and Edings, JJ.

Taxation—income.

Where a sum is received by the taxpayers in liquidation of losses or damage sustained because of a laborers' strike income tax thereon should be paid for the year in which the payment is made.

Same—same.

Bonds and stock of mainland municipalities and corporations and bank credits in mainland banks held by mainland agents of a local taxpayer take the situs of the local owner under the maxim mobilia sequuntur personam and come within the description of property owned in Hawaii and the income therefrom is taxable under the laws of this Territory.

Same—same.

The maxim, however, is not of universal application and may yield to the exigencies of particular circumstances.

Same—same—losses sustained on the sale of securities—incurred when.

Where a taxpayer through the sale of securities sustains a loss because of the depreciation in the value of the securities the amount of such loss may be deducted from income for the year in which the securities were disposed of.

Same—depreciation or exhaustion of leasehold—deduction from income.

In computing income a proper deduction may be made for actual loss incurred during the taxation period due to exhaustion

of all intangible property arising out of its use and employment in the trade or business of the taxpayer including any loss by reason of the exhaustion of a leasehold by efflux of time if such leasehold was actually employed in the business.

SAME—*same—same.*

The proper course is for the leasehold to be reappraised at the end of each taxation period, and based upon that valuation to deduct a proper amount for the exhaustion of the leasehold occurring during the period, this course to be repeated thereafter at the end of each succeeding taxation period until the termination of the lease.

SAME—*same—same.*

The value of a leasehold due to economic causes will vary and it follows that the amount required to amortize the capital investment will also change from time to time.

### OPINION OF THE COURT BY COKE, C. J.

These two causes are here on original submissions containing agreed statements of fact—a proceeding authorized by section 2381 R. L. 1915 as amended by Act 82 S. L. 1921. The questions involved in both cases are in all material respects parallel and will therefore be consolidated and discussed in a single opinion but a separate judgment will be entered in each proceeding conformably to the decision. The two plaintiffs above named, to wit, Ewa Plantation Company and Hawaiian Sugar Company, are domestic corporations and the defendant Charles T. Wilder is the tax assessor for the first taxation division of the Territory of Hawaii. The controversy is in respect to the amount of income taxes due from the two plaintiff corporations to the Territory of Hawaii in the year 1921 from income received in 1920.

The agreed statements of fact are entirely too voluminous to be recited here but the questions at issue may be summarized as follows: (1) Whether the amount received by Ewa Plantation Company from the Hawaiian Sugar Planters Association in 1920 by way of compensation for losses incurred by reason of the laborers' strike

on the Island of Oahu should be accounted for as a whole
as a receipt during the year 1920, or may be apportioned
to the crops of 1920, 1921 and 1922 in accordance with the
prevailing system of accounting upon the crop method;
(2) whether interest upon mainland investments, includ-
ing municipal bonds, accruing during the taxation period
is taxable income under the law of this Territory as ap-
plied to the agreed facts; (3) whether the amount of loss
sustained through the sale of shares in the Sugar Factors
Company during 1920 is deductible as a loss in comput-
ing the income taxes of the said companies for the year
1920 under the facts set forth in the submissions;
(4) whether the amount of loss sustained through the
sale of mainland bonds sold and realized upon during the
year 1920 is deductible as a loss in computing the income
taxes of the said companies for the year 1921 under the
facts set forth in the submissions; (5) whether the
amount of depreciation in value of a leasehold should be
allowed as a deduction in computing the income tax of
the Hawaiian Sugar Company for the year 1920 under
the law of this Territory as applied to the agreed facts.

As thus categorically classified the several subjects
will be taken up and disposed of except that the questions
set forth in paragraphs 3 and 4 being closely allied and so
nearly analogous will be considered and determined
together.

### STRIKE RECEIPTS.

The first question concerns solely the Ewa Plantation
Company and grows out of a laborers' strike begun in the
early part of 1920 and which ended in July of the same
year, conducted by the Filipino and Japanese laborers
employed on the sugar plantations on the Island of Oahu,
the Ewa Plantation being among those affected. It
appears that the Hawaiian Sugar Planters Association,
which is composed of practically all of the sugar produc-

ing concerns in the Territory, entered into an agreement with the plantations on Oahu by which the latter plantations were to resist the demands of the strikers and at the conclusion of the strike the association was to make reimbursement to them for all losses sustained by reason of the strike. Following the conclusion of the strike it was ascertained that the strike losses amounted to $12,119,317.30 made up of $635,959.42 in expenses incurred by the association and $11,483,357.88 in losses sustained directly by the several plantations on Oahu affected by the strike. All of the plantation members of the association paid their pro rata of the $12,119,317.30 on or before December 31, 1920, the pro rata of the Ewa Plantation being the sum of $721,818.95. The said Ewa Plantation received in full settlement of its strike losses on its claim for reimbursement thereof the sum of $2,791,697.72, this amount being made up of estimated losses in taxable profits as follows: For the crop of 1920, $2,324,931.75; for the crop of 1921, $133,706.29, and for the crop of 1922, $333,059.68. The Ewa Plantation in its income tax return for the year 1920 deducted the said sum of $721,818.95 contributed by it as its pro rata of the gross losses as aforesaid and returned the said sum of $2,324,931.75 only as income for the year 1920 on the amount which it received from the association as its share of the loss sustained. Under these facts it is the contention of the company that the other two amounts, namely, $133,706.29 and $333,059.68 were received on account of losses of taxable profits on the crops of 1921 and 1922 respectively and should be returned as income for those respective years and therefore were properly excluded from its 1920 return. It is the contention of the tax assessor that since the two last mentioned sums were actually received during the 1920 taxation period, whether they be regarded as advance realizations of the 1921 and 1922 crops or other-

wise, they should be returned as income accruing during the 1920 taxation period.

It is agreed that should the contention of the assessor be sustained on this point the amount of income taxes payable by said company should be increased by the sum of $18,607 over the amount shown by the company's said return. The statutory provisions bearing upon the questions at issue are to be found in section 1305 R. L. 1915 which provides that the taxation period shall be the year immediately preceding the first day of January of each year in which the tax is payable. Section 1306 R. L. 1915 provides that there shall be levied and collected a tax of two per cent. on the net profit or income above actual operating and business expenses derived during the taxation period from all property owned and every business, trade, employment or vocation carried on in the Territory of Hawaii, and section 1307 provides that "in estimating the gains, profits and income of any * * * corporation, there shall be included all income derived from interest upon notes," etc., "and all other gains, profits and income derived from any source whatsoever during said taxation period." Section 1307 also provides that "in estimating the gains, profits and income of any person or corporation, there shall be included * * * the amount of sales of movable property, less the amount expended in the purchase or production of the same."

The company contends that under the paragraph last above quoted the several sums received from the Hawaiian Sugar Planters Association should not be taken into account for taxation purposes until and as each crop shall have been sold and the net result ascertained. The company relies upon the decisions rendered in *Tax Assessor* v. *Laupahoehoe Sugar Company,* 18 Haw. 206, and in the *Income Tax Appeal Cases,* 18 Haw. 596, 599. In each of these cases it was held that moneys expended prior to the

taxation period in the production of sugar were deductible, not in the period in which the expenditure was made but at the time the crop was sold. These decisions we think are in accord with the provisions of the statute. In the present case, however, we are confronted with a different set of facts. It must be borne in mind that we are now dealing with a receipt and not an expenditure. The amount paid was merely in liquidation of an estimated loss or damage sustained by the company because of the strike. Whether this estimate proves to be even approximately correct will necessarily depend upon many contingencies, but irrespectvie of that feature it is plain to us that the company has not the power merely by an arrangement with the Hawaiian Sugar Planters Association, or for the sake of harmony in its accounting system or otherwise, to convert a sum received by it as compensation for damages caused by the laborers' strike into an amount expended in the purchase or production of specific growing crops of sugar cane. No such feat is sanctioned by the statutes of Hawaii heretofore quoted nor by the decisions in 18 Haw., *supra,* which point out that the amount expended in the purchase or production of movable property should be carried over from year to year and deducted at the period when the property is sold, which merely follows the mandate of the statute, but neither the sum involved here nor any part thereof was expended in the purchase or production of movable property and hence the whole amount thereof is included within "other * * * income * * * derived from any source whatsoever during said taxation period." And as the payment was made during the year 1920 the income tax thereon became due in the following year as provided by statute.

INTEREST ON MAINLAND SECURITIES AND BANK DEPOSITS.

It is set forth in the submissions that ever since the

incorporation of the Ewa Plantation Company Castle & Cooke, Limited, an Hawaiian corporation, has been its general agent at Honolulu and during upwards of twenty years last past Welch & Company, a California corporation with offices in San Francisco, has been the agent at that place of said Castle & Cooke, Limited, and at all times during said period the sugar produced by said Ewa Plantation Company has been sold on the mainland of the United States and the proceeds of sale have been received by said Welch & Company and deposited in California banks and credited on its books to Castle & Cooke, Limited, for the account of said Ewa Plantation Company, against which credits said Ewa Plantation Company has drawn from time to time as money was required by it for the payment of the expenses of its plantation and dividends upon its stock; that bonds and notes of foreign (mainland) railroad and industrial corporations were purchased by said Welch & Company for the account of said Ewa Plantation Company with surplus moneys of the latter so held as aforesaid by the former company and the said bonds and notes thereafter until they were sold on the mainland remained on deposit with said Welch & Company and none of said bonds and notes or the proceeds with which they were purchased have been held in said Territory nor have they been physically present therein at any time; that during the period of upwards of twenty years last past Alexander & Baldwin, Limited, an Hawaiian corporation having offices in Hawaii, California and New York, has been the agent of the Hawaiian Sugar Company; that the president of said Alexander & Baldwin, Limited, was and is in charge of its said California offices and other officers or employees thereof or representatives of said Hawaiian Sugar Company with power to effect transfers of its stock which is listed on the San Francisco stock exchange; that at all times during

said period the sugar produced by said Hawaiian Sugar Company has been sold on the mainland of the United States and the proceeds of sale have been received by said Alexander & Baldwin, Limited, at either one or the other of its said offices on the mainland and there credited to the account of said Hawaiian Sugar Company, against which said credit said Hawaiian Sugar Company has drawn from time to time as money was required by it for the payment of the expenses of its plantation and dividends upon its stock; that bonds of certain municipalities on the mainland of the United States and of foreign (mainland) railroad corporations were purchased on the mainland by said Alexander & Baldwin, Limited, for the account of said Hawaiian Sugar Company with surplus moneys of the latter so held as aforesaid by the former company and said bonds thereafter until they were sold by said Alexander & Baldwin, Limited, on said mainland were held by it at its offices in California or New York and none of such bonds have been held in said Territory nor have they or said proceeds with which they were purchased been physically present therein at any time.

The Ewa Plantation Company and Hawaiian Sugar Company, respectively, deducted the interest arising from these investments as income for the year 1920 in its territorial income tax return, the amount deducted by the Ewa Plantation Company being $52,442.23, and the amount deducted by the Hawaiian Sugar Company being $32,659.66. Upon these facts it is the contention of said companies that the interest accruing from said bonds, notes and bank deposits was not taxable as income derived from property owned in the Territory of Hawaii or otherwise under the laws of said Territory. On the other hand it is claimed by the assessor that said interest upon said bonds, notes and bank deposits was and is taxable income of said companies under the laws of Hawaii. It

is agreed that should the contentions of the assessor be sustained the amount of income tax payable by said Ewa Plantation Company should be increased by the sum of $2097.68 over the amount shown by the company's said return, and that the amount of income tax payable by said Hawaiian Sugar Company should be increased by the sum of $1306.56 over the amount shown by the company's said return.

In the case of the latter company there is an attempt to draw a distinction between interest on mainland and foreign investments and municipal bonds of mainland cities. We think these investments are all on the same plane so far as the principles involved are concerned and will be dealt with in this opinion accordingly.

It is regrettable that while the submissions contain statements to the effect that the proceeds of the sales of sugar by the mainland agencies of the taxpayers were placed to the general credit of the local companies to be drawn against from time to time as funds were required by them for the payment of their operating expenses, etc., the submissions are silent respecting the disposition and use of the income derived from the mainland investments now in question. In the absence of a showing to the contrary we are led to assume that the income received from these mainland securities and bank deposits was dealt with in the same manner as the proceeds from the sales of sugar.

The statute by virtue of which the assessor claims the income from these investments is properly taxable as income is section 1306 R. L. 1915. This statute reads as follows: "On corporation income. There shall be levied, assessed, collected and paid annually, except as hereinafter provided, a tax of two per cent. on the net profit or income above actual operating and business expenses derived during each taxation period, from all property owned, and every business, trade, employment or vocation,

carried on in the Territory of Hawaii, of all corporations, doing business for profit in the Territory, no matter where created and organized; provided, however, that nothing herein contained shall apply to corporations, companies or associations, conducted solely for charitable, religious, educational or scientific purposes, including fraternal beneficiary societies, nor to insurance companies, taxed on a percentage of the premiums under the authority of another law." If this statute be stripped of the language not material to the cases at bar it would read: "There shall be levied, assessed, collected and paid annually a tax of two per cent. on the net income from all property owned in the Territory of Hawaii of all corporations doing business for profit in the Territory, no matter where created or organized." At the very outset counsel for the Territory concede that the phrase "owned in Hawaii" as employed in section 1306 must be taken as referring to the property and not the owner and the final form of the question is, "Are these bonds and deposits property in Hawaii," and that "the case stands as though the statute read 'income from property in Hawaii owned by the taxpayer.' " We are not as ready as counsel to accept this construction of the meaning of the statute. It seems to us that it could be strongly argued that the phrase "property owned in Hawaii" has reference to the place of ownership and not to the location of the property. We are referred to the rule that in the construction of a statute the language employed should be taken in its common and usual signification and we are reminded that if a person were asked, "What property do you own in the Territory?" he would not in answering enumerate bonds and notes of foreign or mainland corporations or deposits in foreign or mainland banks. This may be true, but on the other hand if the San Francisco agents of these corporations were asked in respect to the property in ques-

tion, "Where are these bonds, notes or bank credits owned?" the answer obviously would be, "In the Territory of Hawaii," and that answer would be entirely correct. We will not pursue this discussion further for the reason that even adopting the construction placed upon the statute by the parties the result will be the same.

If it be conceded that the statute refers to the income from property situated in Hawaii the position of the assessor can only be sustained by invoking the doctrine of the maxim *mobilia sequuntur personam,* that is to say, that movables follow the person of the owner. Counsel for the taxpayers urge that the maxim has been repudiated in this jurisdiction by the supreme court in *Hackfeld v. Minister of Finance,* 3 Haw. 292; *Hackfeld v. Luce,* 4 Haw. 172, and *Estate of Hall,* 19 Haw. 531. It is further contended that if the maxim is an enforceable rule in this jurisdiction yet under the circumstances here divulged the bonds, notes, etc., have become localized and thus have acquired a business situs in San Francisco. Counsel for the taxpayers cite many authorities bearing upon the question, the leading ones being *State Tax on Foreign-held Bonds,* 15 Wall. 300; *New Orleans v. Stempel,* 175 U. S. 309; *Bristol v. Washington County,* 177 U. S. 133; *Union Transit Co. v. Kentucky,* 199 U. S. 194; *Liverpool & London & Globe Ins. Co. v. Board of Assessors,* 221 U. S. 346; *DeGanay v. Lederer,* 250 U. S. 376. The general trend of these authorities is that tangible personal property permanently located in a State other than the domicile of the owner acquires a situs and is subject to be there taxed irrespective of the domicile of the owner and any attempt on the part of the State in which the owner is domiciled to tax such property is unlawful; that the maxim *mobilia sequuntur personam* is a legal fiction to be resorted to only when convenience and justice require. It is further held that bonds and other

negotiable instruments are becoming more and more to be looked upon and regarded as property and not merely as evidences of debt. The case of *DeGanay* v. *Lederer* is the leading case and perhaps the strongest cited in support of the position maintained by counsel for the taxpayers. In that case certain stocks and bonds issued by Pennsylvania corporations and mortgages secured on real estate in the same State were owned by an alien resident of France and were in the hands of an agent in this country acting under a power of attorney which authorized and empowered the agent to sell, assign and transfer any of the property and to invest and reinvest the proceeds as it might deem best in the management of the business and affairs of the owner. The question was whether the income from this property was subject to tax under the federal income tax law of October 3, 1913, as income from property owned in the United States by persons residing elsewhere, and it was held that it was in the following language: "We have no doubt that the securities herein involved are property. Are they property within the United States? It is insisted that the maxim *mobilia sequuntur personam* applies in this instance, and that the situs of the property was at the domicile of the owner in France. But this court has frequently declared that the maxim, a fiction at most, must yield to the facts and circumstances of cases which require it; and that notes, bonds and mortgages may acquire a situs at a place other than the domicile of the owner, and be there reached by the taxing authority. It is only necessary to refer to some of the decisions of this court. *New Orleans* v. *Stempel,* 175 U. S. 309; *Bristol* v. *Washington County,* 177 U. S. 133; *Blackstone* v. *Miller, supra; State Board of Assessors* v. *Comptoir National d'Escompte,* 191 U. S. 388; *Carstairs* v. *Cochran,* 193 U. S. 10; *Scottish Union & National Ins. Co.* v. *Bowland,* 196 U. S. 611; *Wheeler* v. *New*

*York,* 233 U. S. 434, 439; *Iowa* v. *Slimmer,* 248 U. S.᾽ 115, 120. Shares of stock in national banks, this court has held, for the purpose of taxation may be separated from the domicile of the owner, and taxed at the place where held. *Tappan* v. *Merchants' National Bank,* 19 Wall. 490. In the case under consideration the stocks and bonds were those of corporations organized under the laws of the United States, and the bonds and mortgages were secured upon property in Pennsylvania. The certificates of stock, the bonds and mortgages were in the Pennsylvania Company's offices in Philadelphia. Not only is this so, but the stocks, bonds and mortgages were held under a power of attorney which gave authority to the agent to sell, assign or transfer any of them, and to invest and reinvest the proceeds of such sales as it might deem best in the management of the business and affairs of the principal. It is difficult to conceive how property could be more completely localized in the United States. There can be no question of the power of Congress to tax the income from such securities. Thus situated and held, and with the authority given to the local agent over them, we think the income derived is clearly from property within the United States within the meaning of Congress as expressed in the statute under consideration."

It is worthy of note that in the *DeGanay* case the court emphasized the fact that the stocks, bonds and mortgages were held in Pennsylvania under a power of attorney which gave authority to the agent to sell, assign and transfer any of them and to invest and reinvest the proceeds of sale as it might deem best in the management of the business and affairs of the principal. No such situation exists in the cases at bar. The mainland agents of the taxpayers were apparently clothed only with authority to purchase and hold the securities and as the income thereon was received to place the same to the credit of

their principals to be drawn upon from time to time as money was required for the payment of the expenses of their plantations and dividends upon their stock. These securities therefore were not localized nor did they enjoy a business situs such as is referred to in the *DeGanay* case. But even in that case, while the court held that they were subject to the federal income tax law because of their local situs within the United States, the court did not infer by that that the income thereof would not have been taxable at the domicile of their owner; and the same may be said of the income from the securities now in question. The mere fact that such income might be taxable in Hawaii under our local statute is no authority for holding that the same income might not be taxed in the State of California under the income tax laws of that State, for liability to taxation in one State does not necessarily exclude liability in another. *Kidd* v. *Alabama,* 188 U. S. 730, 732; *Hawley* v. *Malden,* 232 U. S. 1, 13. *Kirtland* v. *Hotchkiss,* 100 U. S. 491, is a case concerning Illinois bonds secured by a deed of trust upon property situated in the latter State. In that case the court held that the debt "although a species of intangible property may for the purposes of taxation, if not for all others, be regarded as situated at the domicile of the creditor. It is none the less property because its amount and maturity are set forth in a bond. That bond, wherever actually held or deposited, is only evidence of the debt, and if destroyed, the debt—the right to demand payment of the money loaned with the stipulated interest—remains. Nor is the debt, for the purposes of taxation, affected by the fact that it is secured by mortgage upon real estate situated in Illinois. * * * The debt then having its situs at the creditor's residence, both he and it are for the purposes of taxation within the jurisdiction of the State." The general principles laid down in the *Kirtland-Hotch-*

*kiss* decision are referred to in *Fidelity & Columbia Trust Co.* v. *Louisville,* 245 U. S. 54, at 59, as affirmed and assumed to be the law in every subsequent case, citing *Bonaparte* v. *Appeal Tax Court,* 104 U. S. 592; *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18, 29, 31; *Savings & Loan Society* v. *Multnomah County,* 169 U. S. 421, 431; *New Orleans* v. *Stempel, supra; Liverpool & London & Globe Ins. Co.* v. *Assessor, supra.*

And finally the principle involved was again passed upon in the late case of *Maguire* v. *Trefry,* 253 U. S. 12. This is not only a most recent case but is we think the controlling authority. The question in that case was whether the income received by the beneficiary from a trust estate consisting of bonds and equipment certificates held and administered by the trustee in another State is taxable by the State of the beneficiary's domicile. The question was answered in the affirmative. It appears that the beneficiary resided in the State of Massachusetts and was taxed upon income from a trust created by the will of one Matilda P. McArthur, formerly of Philadelphia. The securities consisting of bonds of other corporations and certain certificates of the Southern Railway Equipment Company were held in the possession of the trustee in Philadelphia and the trust was administered under the laws of the State of Pennsylvania. The tax commissioner of the Commonwealth of Massachusetts attempted to levy a tax upon the revenues derived by the beneficiary from said securities under the income tax statute of that State. In its opinion the court says: "It is true that in some instances we have held that bonds and bills and notes although evidences of debt have come to be regarded as property which may acquire a taxable situs at the place where they are kept, which may be elsewhere than at the domicile of the owner. These cases rest upon the principle that such instruments are more than mere evidences

of debt, and may be taxed in the jurisdiction where located and where they receive the protection of local law and authority. * * * At the last term we held in *DeGanay* v. *Lederer,* 250 U. S. 376, that stocks and bonds issued by domestic corporations, and mortgages secured on domestic real estate, although owned by an alien non-resident, but in the hands of an agent in this country with authority to deal with them, were subject to the Income Tax Law of October 3, 1913, 38 Stat. 166. In the present case we are not dealing with the right to tax securities which have acquired a local situs but are concerned with the right of the State to tax the beneficiary of a trust at her residence, although the trust itself may be created and administered under the laws of another State. In *Fidelity & Columbia Trust Company* v. *Louisville,* 245 U. S. 54, we held that a bank deposit of a resident of Kentucky in the bank of another State, where it was taxed, might be taxed as a credit belonging to the resident of Kentucky. In that case *Union Refrigerator Transit Co.* v. *Kentucky, supra,* was distinguished and the principle was affirmed that the State of the owner's domicile might tax the credits of a resident although evidenced by debts due from residents of another State. This is the general rule recognized in the maxim *mobilia sequuntur personam,* and justifying, except under exceptional circumstances, the taxation of credits and beneficial interests in property at the domicile of the owner. We have pointed out in other decisions that the principle of that maxim is not of universal application and may yield to the exigencies of particular situations. But we think it is applicable here. It is true that the legal title of property is held by the trustee in Pennsylvania, but it is so held for the benefit of the beneficiary of the trust and such beneficiary has an equitable right, title and interest distinct from its legal ownership. * * * It is this property right belonging to the

beneficiary, realized in the shape of income, which is the subject-matter of the tax under the statute of Massachusetts. · The beneficiary is domiciled in Massachusetts, has the protection of her laws, and there receives and holds the income from the trust property. * * * The case presents no difference in principle from the taxation of credits evidenced by the obligations of persons who are outside of the State which are held taxable at the domicile of the owner. *Kirtland* v. *Hotchkiss,* 100 U. S. 491."

This case is important for here in the last word upon the subject the Supreme Court of the United States has not only adopted and applied the maxim *mobilia sequuntur personam* but has directly reaffirmed the decision in *Kirtland* v. *Hotchkiss.* In *Union Transit Co.* v. *Kentucky, supra,* the court points out that stocks, bonds, notes and choses in action are classified as intangible property and a clear distinction is drawn between that kind of property and tangible personal property such as railway cars having a situs of their own and taxable only in the territorial limits of that situs. But with intangible personal property such as stocks, bonds and bank credits the rule ordinarily is different. This class of property takes the situs of the domicile of its owner by virtue of the maxim *mobilia sequuntur personam,* except under unusual circumstances which do not exist in the cases at bar.

The further point is made by counsel for the taxpayers that the local supreme court in the three Hawaiian cases *supra* has repudiated entirely the maxim *mobilia sequuntur personam* but with this we cannot agree. Some of the expressions made use of would perhaps lead to that inference but after a careful review of those opinions, taken in the light of the law and facts involved, we conclude that the most that ought to be said of them is that the court merely intended to hold, as the Supreme Court

of the United States has since held in *Maguire* v. *Trefry*, *supra*, that the maxim is not of universal application and may yield to the exigencies of particular circumstances.

And finally it is urged that "at no time heretofore has said assessor or his predecessors in office considered income derived from such investments as taxable or included the same in assessing the incomes of corporations or individuals under the laws of the Territory" and that the rule of contemporaneous construction should be given great weight by this court. The rule is that the contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is to .be regarded as a ligitimate aid to statutory construction and is entitled to most respectful consideration and should not be disregarded or overturned except for cogent reasons. See *United States* v. *Moore*, 95 U. S. 760, also *United States* v. *Johnston*, 124 U. S. 236, at 253, and authorities there cited. But the rule which gives determining weight to contemporaneous. construction put upon a statute by those charged with its execution applies only in cases of doubt and ambiguity. Courts will ordinarily make use of the contemporaneous construction of a statute by executive and administrative officials as an aid to interpretation but an erroneous construction can never be binding upon the judiciary.

We conclude that the income in question was and is taxable as now claimed by the assessor.

LOSS ON SUGAR FACTORS STOCK AND MAINLAND BONDS.

The material facts are that during the years 1904-1917 the Ewa Plantation Company purchased 4828 shares of the stock of the Sugar Factors Company paying therefor the par value of $100 per share. The stock thereafter declined in value and finally in the year 1920 the plantation company sold its entire holdings in said stock at $40

per share, thus sustaining a loss of $289,608.   The same facts exist in relation to the case of the Hawaiian Sugar Company except that the number of shares involved was 1770 and the loss was $106,200.   The taxpayers claimed these respective amounts as proper deductions from gross income in ascertaining the net profits for income tax purposes during the taxation period ending December 31, 1920.   The statutory provisions applicable are found in sections 1306 and 1307 R. L. 1915 and section 1 of Act 157 S. L. 1917 amending section 1308 R. L. 1915.   Section 1308 as amended prescribes the manner of computing the income of corporations for taxation purposes and specifically permits the deduction therefrom of "all losses actually sustained during the taxation period next preceding incurred in trade or arising from losses by fire not covered by insurance or losses otherwise actually incurred."

Counsel for the Territory concede that the transactions consisting of the purchase and sale of this stock resulted in losses in the above amounts to the two companies and they further concede that these losses have been actually sustained or actually incurred by the two companies as distinguished from losses which are merely conjectural or estimated; but they make the point, which they rely upon exclusively, that the losses were not sustained within the taxation period now in question, which was the calendar year 1920.   They point out that the statute expressly provides that all losses actually sustained must be sustained during the taxation period preceding January 1 of the year in which the tax is imposed. They assert that the stock fluctuated in value from time to time between the date of the purchase and the date of sale and that the losses which the sales demonstrated and fixed in amount were the result of the entire transaction covering the whole period of years in which they

were held, and from these.facts they draw the conclusion that the losses are not attributable to any one year of that series; that while the losses were "ascertained" at the time of the sale, to wit, in 1920, they were not "sustained" in that year.

The three leading cases relied upon by counsel for the Territory are *In re Taxes Pacific Guano & Fertilizer Co.*, 16 Haw. 552; *Appeal of J. B. Castle*, 18 Haw. 129, and *Gray* v. *Darlington*, 15 Wall. 63. In the *Pacific Guano* case the taxpayer in 1894 paid $85,000 for all of the Laysan Island guano rights in the belief and upon the advice of experts that there were about 85,000 tons of guano on the island. In 1903 the company discovered that there was only about half of the anticipated amount of guano on the island and during that taxation period the company. wrote off $50,000 to account of profit and loss and claimed that amount to be a loss deductible from its income for that year. It was held by this court that "the loss which was finally ascertained upon the termination of that business did not occur at the time when it was learned that the guano supply had failed, but it occurred. when the purchase money was paid," and the court proceeded to say: "In one sense a loss is made at the time when one learns that he has not got what he thought he had. In another sense, and as we think in the meaning of the statute, there is in such case no actual loss other than results from an unfortunate investment at the outset." With that opinion we are in entire accord. But in the present case we are dealing with corporation stock which for a series of years following its purchase had fluctuated. It was held during the entire time by the purchaser and finally sold at the then prevailing market price. The losses it seems to us were sustained or incurred at the time of the sale. If that were not true the loss incurred by the purchaser of this class

of property which was held over a number of years and during the period of a fluctuating market could never be determined for the simple reason that it could not be ascertained at what particular period the loss actually occurred. The courts have universally adopted the reasonable, and we might add the only fair, method of computing the loss, and that is by taking the difference between the cost price and the amount realized at the date of sale, and if the latter amount is less than the former then the loss is reckoned as having been sustained at the date of sale. A corporation possessing securities such as stocks and bonds will not be allowed to deduct from gross income an amount claimed as a loss on account of shrinkage in value of such securities through market fluctuation but will in such cases be allowed any loss actually suffered when the securities are disposed of.

The decision of this court *In re Appeal of J. B. Castle, supra,* asserts a mere conclusion, entirely devoid of any reasons therefor except that it is based upon the decision in *Gray* v. *Darlington, supra,* a case involving the construction of the Revenue Act of 1867 (14 Stat. 477, c. 169).

The United States Supreme Court in a recent decision (*Hays, Collector,* v. *Gauley Mountain Coal Co.,* 247 U. S. 189) distinguished the corporation excise tax act of August 5, 1909, from the act of March 2, 1867, under which *Gray* v. *Darlington* was decided, and held that where property is sold by a corporation at an advance over the original purchase price the amount of the advance must be deemed to be a gain or profit for the purpose of computing income for taxation under the federal statute. See also *Merchants' Loan & Trust Co.* v. *Smietanka,* decided by the federal Supreme Court March 28, 1921, and Holmes, Fed. Taxes, p. 632.

In October, 1913, Congress enacted an Income Tax

Act which provided that in case of persons there should be deducted from gross income in arriving at taxable income "losses actually sustained during the year incurred in trade or arising from fires, storms and shipwrecks not compensated for by insurance or otherwise," and in the case of corporations it was provided that there should be deducted "all losses actually sustained within the year and not compensated as insurance or otherwise." The treasury department through regulations issued by it took the position in respect to this act as well as subsequent acts containing similar language that where a corporation possesses securities such as stocks and bonds it cannot be allowed to deduct from gross income any amount claimed as a loss on account of the shrinkage in value of such securities through fluctuations on the market or otherwise, the only losses to be allowed in such cases being those actually suffered when the securities mature or are disposed of.

There are several subsequent treasury department regulations to the same effect, the latest one called to our attention being article 44, Regulations 451, April 7, 1919, which reads: "Shrinkage in securities and stocks. A person possessing securities such as stocks and bonds cannot deduct from gross income any amount claimed as a loss on account of the shrinkage in value of such securities through fluctuations in the market or otherwise. The loss allowable in such cases is that actually suffered when the securities mature or are disposed of." The decisions and rulings promulgated by the treasury department are of course not binding upon the court but as indicated *supra* they are entitled to consideration. These rulings are significant when considered in light of the fact that the language of the federal statute is no broader or more comprehensive than the territorial statute now under consideration.

There is a dearth of federal judicial authority on the question before us, due no doubt to the fact that the federal government has uniformly acquiesced in the position here assumed by the taxpayers and which we deem to be the only fair and practicable method of ascertaining losses of the nature involved.  It is a notorious fact that during the last decade all stocks and bonds throughout the world have violently fluctuated with the greatest frequency, often changing in value from time to time with kaleidoscopic rapidity.  This fact alone would render it impossible to determine the actual time at which the losses were sustained by the taxpayers, if the method of ascertaining those losses .proposed by counsel for the assessor were adopted, and would deprive the taxpayers of the benefit of deductions from gross income caused by losses which it is conceded they actually sustained.

All that has been said respecting the losses suffered by the taxpayers on the Sugar Factors Company stock applies with equal force to their losses in respect to the various railroad, industrial, municipal and United States bonds, and sold as aforesaid in 1920.

We therefore hold that the losses sustained by the taxpayers through the sales of stocks and bonds referred to in the third and fourth paragraphs above, realized upon during the year 1920, amounting in the case of the Ewa Plantation Company to $487,432.11, and in the case of the Hawaiian Sugar Company to $268,431.78, are deductible as losses in computing the income taxes of said respective companies for the year 1920 under the facts set forth in the submissions herein.

### DEPRECIATION OF LEASEHOLD

This controversy affects only the Hawaiian Sugar Company.  It appears in the submission that the company's plantation is situated entirely upon leasehold lands

which are covered by a single lease. The lease was executed for a term of fifty years from January 1, 1889. The lease as originally executed by Gay & Robinson as lessors was made to one W. R. Watson as lessee, who in the same year assigned the same to the Hawaiian Sugar Company for the consideration of $50,000. It appears that the leasehold interests were carried on the books of the company at that figure, less an annual amount written off for depreciation, until 1899 when a reappraisement was made of the property of the company and the value of the leasehold was fixed at $300,000. This leasehold was from that date carried on the books of the company until 1902 when $8,333 was written off for depreciation, leaving a balance of $291,667, and thereafter the sum of $8,101.86 was written off each year until 1920, this being the amount which if written off each year from 1902 would amortize the said sum of $291,667 at the time of the expiration of the lease, to wit, December 31, 1938. During this entire period and until the passage of Act 157 S. L. 1917, which became effective April 27, 1917, depreciation or exhaustion was not an allowable deduction under the laws of the Territory and no item for depreciation or exhaustion was claimed by the company in respect to said leasehold until it filed its tax return for the year 1917 when it claimed and was allowed among other items the sum of $8,101.86 as depreciation of said leasehold. Deductions of a like amount were also claimed and allowed for each of the two succeeding years, to wit, 1918 and 1919. In the year 1919 the company for federal income tax purposes reappraised and revalued the leasehold in question fixing the amount of the value thereof as of March 1, 1913 (the effective date of the federal statute), at the sum of $2,069,134.58, in addition to the balance which it estimated would remain on the purchase price of $50,000 of said leasehold after deduct-

ing therefrom as depreciation at the rate of $1001.64 every year for the then unexpired portion of the term of said leasehold, the latter being then estimated as the proper amount to write off from such purchase price in order to amortize its entire amount by the date of the expiration of the lease. The company in order to amortize said value of the leasehold as of March 1, 1913, by the date of the expiration thereof, and in making its return for the year 1920, deducted therefrom on account of the depreciation or exhaustion of said lease upon the value thereof fixed by it as aforesaid the sum of $81,-093.30, and the question now presented is whether under the facts stated and the statutes of the Territory this item is properly deductible. That part of Act 157 S. L. 1917 which is material here is as follows: "In computing income the necessary expenses actually incurred in carrying on any business, trade, profession or occupation, or in managing any property, shall be deducted, and also all interest paid by such person or corporation on existing indebtedness. And all government taxes, and license fees, paid within the taxation period next preceding shall be deducted from the gains, profits or income of the person who, or the corporation which, has actually paid the same, whether such person or corporation be owner, tenant or mortgagor; also all losses actually sustained during the taxation period next preceding incurred in trade, or arising from losses by fire not covered by insurance, or losses otherwise actually incurred, and including a reasonable allowance for the exhaustion, wear and tear of property arising out of its use or employment in a business or trade; provided, however, that in no case shall such depreciation exceed the amount actually shown by and as written off the books."

The deduction clause of the foregoing local statute is copied from the federal Income Tax Act of 1916. The

controversy presents two main questions. The first is whether depreciation or exhaustion of a lease is an allowable deduction under the income tax laws of Hawaii, and if this question is answered in the affirmative then the second question arises, to wit, how should the amount of such depreciation or exhaustion be determined.

It is urged by counsel for the Territory that there can be no such thing as either exhaustion, wear or tear of intangible property; that these terms refer solely to physical property and can in no case be held to apply to leasehold interests. We agree with counsel that, taken in their usual and ordinary sense, the words "wear and tear" could not be applied to a leasehold, but we are not ready to agree that there cannot be an exhaustion of a leasehold. It seems to us that a leasehold for a term of years is gradually being exhausted as the term or life thereof is shortened by the efflux of time.

It is further urged by counsel for the Territory that even if a leasehold may be exhausted the exhaustion under the statute must arise out of the use or employment of the property in the business or trade; that the passing away of the lease by the efflux of time did not arise out of its use or employment in the plantation business of the company and was not caused by any such use or employment; that by the very nature of things the exhaustion of the lease was bound to occur irrespective of whether or not the lands covered by the demise or the lease itself were used or employed in the business; that the lands might lie idle during the whole tenure of the lease yet the passing of the term would be going on in spite of the nonusage. It must be conceded that this is an argument of much plausibility and in the interpretation of the statute in this respect a question of much difficulty is encountered. If we were to indulge in the refinements of the lexicographer or of the strict gram-

marian we would perhaps be led to an adoption of the views of counsel for the Territory. On the other hand, if in reading the statute we interpret its phraseology in the natural and obvious sense in which that phraseology was employed and without too much regard to form (see *Eisner* v. *Macomber,* 252 U. S. 189, 206) we must conclude that it was the intent and purpose of the legislature to permit the taxpayer in computing his income to deduct therefrom actual losses incurred during the taxation period due to the exhaustion of all intangible property arising out of its use or employment in his trade or business, including any loss by reason of the exhaustion of a leasehold by efflux of time if such leasehold was actually employed in the trade or business. This is in line with the construction placed upon the federal Income Tax Act of 1916 by the treasury department of the National Government under a statute containing language indentical to our own.

Having determined that the loss sustained by reason of the exhaustion by efflux of time of the lease in question is under the facts and circumstances of the case at bar properly deductible from gross income the method to be employed in ascertaining the amount of such deduction will next be inquired into. Counsel for the taxpayer take the position that because in the year 1919 the company appraised the leasehold as of March 1, 1913, at a valuation of $2,069,134.58 and because it is stipulated in the submission that the value of the leasehold was as great on January 1, 1917, as on March 1, 1913, the valuation thus fixed should control and be taken as the proper valuation thereof throughout the life of the lease. It does not follow at all that because the company appraised the leasehold at the value above stated as of March 1, 1913, the true value thereof at that or any subsequent time was ascertained nor could any such appraisement

be binding upon the assessor or upon this court for the actual value and not the value arbitrarily fixed should determine the amount to be cared for by depreciation. (Black on Income Tax, 4th ed. Sec. 187.) It would be useful to know the valuation placed upon the leasehold by the company for the purpose of fixing the property tax to be paid thereon to the Territory. This record of course is available and would, if it indicates that the leasehold was returned by the taxpayer at the valuation of $2,069,134.58, be persuasive evidence of the correctness of that valuation. On the other hand, if the valuation was fixed at a less amount it would tend to refute the claim now made by the company and would indicate an inconsistency which cannot be sanctioned for of course the taxpayer will not be allowed to use one valuation for deduction purposes under the income tax law and another valuation for the purpose of fixing the amount of property tax. We are, however, strongly inclined to assume that the property tax upon the leasehold has been paid on the valuation of $300,000 placed thereon in 1899 less of course a reasonable amount for depreciation. This assumption is based upon the fact that it is shown by the record that the valuation of $300,000 was employed by the taxpayer and assessor in arriving at the proper amount of deduction to be allowed as an offset against gross income for the years 1917, 1918 and 1919.

The proper course would have been for the parties, following the 31st day of December, 1917, to reappraise the leasehold at its then true value and based thereon to fix a proper amount to be allowed for the exhaustion of the leasehold occurring between the effective date of the act and the end of the taxation period, to wit, April 27, 1917, to December 31, 1917, this course to be repeated thereafter at the end of each succeeding taxation period until the termination of the lease, for a lessee should be al-

'lowed a reduction to provide for the amortization of his capital investment on the property measured by the value of the life of the lease. The life of the lease is definitely fixed but the capital investment will vary as the value of the leasehold due to economic causes changes and it follows that the amount required to amortize the capital investment will also change from time to time. But this course the parties did not pursue either in 1917 or in the two following years but instead they merely acquiesced in the value fixed in 1899 and accepted the sum of $8,101.86 for each of said years as a proper amount to be written off on account of the exhaustion of the leasehold.

We are only concerned with the value of the leasehold and the amount of depreciation for the year 1920 but we have nothing in the record before us from which that value or the amount to be allowed for exhaustion covering that year can be determined. Each taxation period should be dealt with separately and independently from every other taxation period. The value of property and the amount of income for each period should be determined annually. To say that the value of taxable assets either for property tax or income tax purposes should for all time remain the same as that value happened to be at the date the statute levying the tax became effective is to assert a proposition palpably unsound, untenable and grossly unfair to both the taxpayer and to the government. Property values shift from year to year and these changes should be taken into account in determining the amount of taxes to be required of each taxpayer annually. The value of the leasehold in question as one of the capital assets of the Hawaiian Sugar Company has varied in the past and will vary in the future as the price of sugar advances, at least so long as the leasehold interests are devoted to the production of sugar.

The mere stating of this well-known economic fact sets

the error of the contention of counsel for the taxpayer in a strong light. The decision in *Doyle* v. *Mitchell*, 247 U. S. 179, is cited as a judicial recognition and approval of the principle that the value of the leasehold should be taken as on the effective date of the act. With that principle we agree but we do not concede, nor is it held in *Doyle* v. *Mitchell* that the value thus determined shall during all subsequent years remain the same and become the criteria for the purpose of arriving at the amount of exhaustion or diminution of capital for income tax purposes. In the case just cited the question arose under the federal excise tax of 1909 and turned upon the proposition that Congress did not intend by the use of the term "income" to include the proceeds of capital assets sold or converted during the year. The company had bought certain stumpage in 1903 at $20 per acre and on December 31, 1908, the actual value had increased to $40 per acre. Under the act the company made a return for each of the years 1909, 1910, 1911 and 1912, and in each instance deducted from its gross receipts the market value ($40 per acre) as of December 31, 1908, of the stumpage cut and converted during the year covered by the tax. The commissioner of internal revenue refused to allow the difference between the cost of the stumpage, that is, $20 per acre, and the market value thereof, to wit, $40 per acre. The court in its opinion sustained the taxpayer but pointed out that there was "no change in market values during these years." But had there been a change in the market value of the stumpage during the years following December 31, 1908, would the result have been the same? We think not. Nor is the decision in *Merchants' Loan & Trust Co.* v. *Smietanka, supra,* and the three companion cases decided by the Supreme Court of the United States on March 28, 1921, any authority for the contention of counsel for the taxpayer. These opin-

ions merely hold that where property is of a certain value at the effective date of the taxing act and is thereafter sold at an advanced price the profit thus realized by the seller is income under the federal statute.

We therefore hold that the actual amount of depreciation in value of the leasehold should be allowed as a deduction in computing the income tax of the Hawaiian Sugar Company for the year 1920 under the laws of the Territory of Hawaii, but because the value of the leasehold at the end of the year 1920 has not been properly ascertained and is unascertainable from the record before us we are not able to fix the amount.

A separate judgment will be entered in each of the proceedings conformably to the views expressed in this opinion.

*A. G. M. Robertson, W. L. Stanley, U. E. Wild, H. Holmes* and *W. F. Frear* (*Robertson, Castle & Olson; Frear, Prosser, Anderson & Marx; Smith, Warren, Stanley & Vitousek* and *H. Holmes* on the briefs) for the taxpayers.

*A. Perry* (*H. Irwin, Attorney General,* and *Perry & Matthewman* on the brief) for the tax assessor.