HELEN STRONG CARTER *v.* HAROLD C. HILL, TAX ASSESSOR FOR THE FIRST TAXATION DIVISION OF THE TERRITORY OF HAWAII.

No. 1830.

ARGUED JANUARY 8, 1930.            DECIDED FEBRUARY 8, 1930.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY BANKS, J.
(Parsons, J., dissenting.)

This is an income tax case and is before us on agreed facts. The primary question involved is whether Helen Strong Carter, referred to as the taxpayer, was under the agreed facts required by our income tax statute to pay a tax during the taxation period of 1926 on her income derived from certain holdings owned by her but actually and physically located in the State of New York. The income upon which the Territory claims the taxpayer was legally bound to pay the statutory tax was derived as dividends on shares of stock of the Eastman Kodak Company, a corporation organized under the laws of New Jersey, and as interest on state bonds and municipal bonds of mainland cities, and as interest on Liberty bonds and on Federal farm loan bonds, and as interest on deposits

in the Bankers' Trust Company of New York City, New York, and as income from her undivided proportionate share of the H. A. Strong estate held in trust by the Security Trust Company of Rochester, New York.

All of the foregoing stocks, bonds and securities were given to the taxpayer by the will of her father who was a resident of the State of New York, or were otherwise received by her from sources on the mainland of the United States and none of the certificates representing said stocks and said bonds and securities have ever been physically present in the Territory of Hawaii, nor has any portion of the bank deposits in the Bankers' Trust Company or any portion of the trust estate created by the will of her father ever been in the Territory of Hawaii.

On the 8th of September, 1922, the taxpayer executed and delivered to one Henry D. Quinby, then residing in New York City, New York, an instrument in writing by which she created and constituted the said Quinby as her attorney in fact. The powers conferred upon Quinby were plenary and authorized him both specifically and generally to do and perform every and any act or thing whatsoever in connection with the management and control of her business affairs that the grantor could herself do and perform. This power of attorney has never been revoked and Quinby has ever since its execution continued to act under it.

The stocks, bonds and securities from which the income in question was derived were and still are in the actual custody of Quinby in the city of New York, as the taxpayer's attorney in fact, and acting under his powers as such attorney in fact he has received and receipted for and still receives and receipts for the dividends and interest paid on said stocks and bonds and securities and has also received and receipted for and still receives and receipts for the interest paid on the bank deposits with

the Bankers' Trust Company and the taxpayer's proportion of the income from the trust estate created by her deceased father. All of these realizations are deposited by Quinby with the Guaranty Trust Company in an account entitled "Helen Strong Carter Custodian Account," and, with the exception of the monthly amount of five thousand dollars, are under Quinby's control and disposition. This amount of five thousand dollars is paid each month from the custodian account into a separate individual checking account in the Guaranty Trust Company in the name of Helen Strong Carter. The taxpayer has a right to draw on the custodian account but has never exercised the right without notifying Quinby. This account is managed exclusively by Quinby, who under his power of attorney draws on it and instructs the Guaranty Trust Company as to all matters concerning it. With the exception of the monthly sums of five thousand dollars and also with the exception of moneys which have recently been sent to the taxpayer for the purchase of property in Nuuanu Valley in the city of Honolulu on which to erect a home and for the construction of a dwelling on said property and also with the exception of moneys which went into the Strong Foundation Dental Infirmary of Honolulu and with the exception of moneys to cover the payment of Federal income taxes, said Federal income taxes being paid on the taxable income from all sources including income received by said Quinby as said attorney in fact and with the exception of moneys for other very specific purposes no portion of the income from the sources above enumerated has ever come to the Territory of Hawaii and none of the funds which have been remitted to the Territory of Hawaii by Quinby have been returned by the taxpayer in her territorial income tax return nor have territorial income taxes been paid on the same.

Except for the remittances above mentioned, made to the taxpayer, and except for special gifts on the mainland of the United States and elsewhere, as, for example, a memorial to Helen Strong Carter's parents in Rochester, New York, for which the taxpayer gave $500,000, the last installment of which was paid in 1927 by Quinby, all of the moneys placed to the account of the Helen Strong Carter Custodian Account have been used to build up a million dollar fund so as to be prepared to pay the estate and inheritance taxes of Helen Strong Carter on her death. This fund has now been completed but Quinby will continue in the exclusive possession, control, custody and management of the stocks, bonds and securities and the income derived therefrom.

Ever since Quinby's appointment as the taxpayer's attorney in fact he has, in pursuance of the powers specifically conferred upon him, exercised the fullest control over her holdings in New York; he has collected the income from these holdings; has borrowed large sums of money, using them as security; has repaid money so borrowed; has made investments, and in short has done everything in connection with these holdings that the taxpayer herself could have done.

The taxpayer claims that under the foregoing facts and the territorial income tax law she is not required to pay a tax on the income derived from the stocks, bonds and other securities held by Quinby under his power of attorney nor on the interest on the bank deposits with the Bankers' Trust Company nor on the income from the trust estate created by her father. The tax assessor takes the opposite position. Our income tax statute (Sec. 1388, R. L. 1925), so far as it relates to individuals, is as follows: "There shall be levied, assessed, collected and paid annually upon the gains, profits and income received by every individual residing in the Territory, from all prop-

erty owned, and every business, trade, profession, employment or vocation carried on in the Territory, and by every person residing without the Territory, from all property owned, and every business, trade, profession, employment or vocation carried on in the Territory, and by every servant or officer of the Territory or any political subdivision thereof, wherever residing, a tax in accordance with the following schedule on the amount so received during the taxation period as herein defined:" (The schedule which follows is unimportant in the instant case and need not be quoted.)

In order to bring more clearly to view the first question presented for our consideration we will requote the statute, omitting all unnecessary portions. Thus requoted the statute is: "There shall be levied, assessed, collected and paid annually upon the * * * income received by every individual residing in the Territory from all property owned * * * in the Territory * * * a tax in accordance with the following schedule on the amount so received during the taxation period as herein defined."

It is contended by the tax assessor that the phrase "from all property owned * * * in the Territory" refers to the residence of the individual who owns the property from which the income is received and not to the location of the property itself. Agreement with this contention would require the statute to be interpreted as though it read, "There shall be levied, assessed, collected and paid annually a tax upon the income received by every individual who resides in the Territory from all property owned by him regardless of its location."

The taxpayer concedes that if this were the true meaning of the statute she would have no ground upon which to contest the payment of the tax. In other words, she concedes (whether properly or improperly we need not now decide) that it is within the power of the legislature

to impose a tax upon every person domiciled within the Territory on income received from all property, whether such property be located within or without the Territory. She earnestly contends, however, that it is evident from the language of the statute that it was the intention of the legislature to require individuals residing in the Territory to pay a tax on income derived solely from property located in the Territory and therefore the power to require the payment of a tax on income from property located elsewhere was not exercised. More specifically, her contention is that the words "property owned * * * in the Territory," as they appear in the statute, refer to the *situs* of the property and not to the domicile of the owner.

We think there is no doubt that this is the true meaning of the statute. In *Ewa Plantation* v. *Wilder,* 26 Haw. 299, the taxpayer contended for a similar construction and so convinced were counsel for the tax assessor (including both special counsel and the attorney general) of its correctness that they conceded the point. It is true that the court expressed some doubt of the tax assessor's position but nevertheless accepted the concession, and while the decision was against the taxpayer it was, as we shall presently see, based on other grounds.

The soundness of our interpretation of the statute is made manifest when its provisions, so far as they relate to nonresidents, are considered. In this connection, omitting impertinent words, the statute provides: "There shall be levied, assessed, collected, and paid annually upon the * * * income received * * * by every person residing without the Territory from all property owned * * * in the Territory * * * a tax in accordance with the following schedule on the amount so received during the taxation period as herein defined." If the contention of the tax assessor, that the words "property

owned * * * in the Territory" mean, so far as they relate to residents, property owned by the individual who is domiciled in the Territory and do not mean property located in the Territory should prevail the same meaning would have to be given to these words in their relation to nonresidents. In that event the conclusive answer of a nonresident, who owns property in the Territory from which he derives income, to an income tax assessment, would obviously be, "I am not a resident in the Territory and therefore the property from which my income is derived is not owned there but in the place of my residence." The legislature certainly never intended to bring about any such result.

Insisting that her construction of the statute is the correct one, the taxpayer does not go so far as to claim, as was done by the taxpayer, without success, in *Ewa Plantation* v. *Wilder, supra,* that the property yielding the income must be actually and physically in the Territory in order to subject the owner to the tax. Recognizing the authority of the *Ewa* case she concedes that if under the maxim *mobilia sequuntur personam* the property is constructively within the Territory it would be sufficient. This brings us to the ultimate question in the case, namely, whether the maxim is applicable under the agreed facts before us.

Under this classic rule of the common law movable property has with great frequency been held to follow the peregrinations of the owner and to be subject to the law of the owner's domicile although actually located elsewhere. This legal fiction, however, has not governed under all circumstances. In many instances it has been obliged to yield to the actual *situs* of the property. In *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18, 22, the court said: "The old rule expressed in the maxim *mobilia sequuntur personam,* by which personal property

was regarded as subject to the law of the owner's domicil, grew up in the middle ages, when movable property consisted chiefly of gold and jewels which could be easily carried by the owner from place to place or secreted in spots known only to himself. In modern times, since the great increase in amount and variety of personal property, not immediately connected with the person of the owner, that rule has yielded more and more to the *lex situs,* the law of the place where the property is kept and used." Again, in *Liverpool, etc., Ins. Co.* v. *Orleans Assessors,* 221 U. S. 346, the court, speaking through Mr. Justice Hughes, said (p. 354) : "The legal fiction, expressed in the maxim *mobilia sequuntur personam,* yields to the fact of actual control elsewhere." In *Ewa Plantation* v. *Wilder, supra,* the court, in speaking of this maxim, said : "The maxim, however, is not of universal application and may yield to the exigencies of particular circumstances."

It is the contention of the taxpayer that under the agreed facts her holdings, from which the income in question was derived, are so permanently located and completely controlled in New York that they have a settled business *situs* in that State and are therefore beyond the influence of the doctrine embodied in the maxim *mobilia sequuntur personam* and cannot be regarded as property having its *situs* in the Territory of Hawaii, where she resides.

In support of her contention the taxpayer calls our attention to the case of *DeGanay* v. *Lederer,* 250 U. S. 376, the decision in which, having been rendered by the highest court in the land, she claims is conclusive of the instant case. Mrs. DeGanay's holdings from which her income was derived were actually and physically located in Pennsylvania and were under the management and control of the Pennsylvania Company, acting under a power of attorney no more specific and comprehensive in its delega-

tion of authority than is that under which the taxpayer's agent in the instant case acted. Under a Federal statute which provided that a tax "shall be assessed, levied, collected and paid annually upon the entire net income from all property owned * * * in the United States by persons residing elsewhere" the taxpayer sought immunity from the tax on the ground that under the maxim *mobilia sequuntur personam* the property from which her income was derived had its *situs* in the country of her domicile and citizenship and not in the United States. The property owned by the taxpayer consisted of stocks and bonds of corporations organized under the laws of the United States and of mortgages that were secured upon property in Pennsylvania. It possessed essentially the same characteristics as the property owned by the taxpayer in the present case. In declining to adopt Mrs. DeGanay's view of the *situs* of the property the court said (pp. 380-383) : "The question submitted comes to this: Is the income from the stock, bonds and mortgages, held by the Pennsylvania Company, derived from property owned in the United States? A learned argument is made to the effect that the stock certificates, bonds and mortgages are not property, that they are but evidences of the ownership of interests which are property; that the property, in a legal sense, represented by the securities, would exist if the physical evidences thereof were destroyed. But we are of opinion that these refinements are not decisive of the congressional intent in using the term 'property' in this statute. Unless the contrary appears, statutory words are presumed to be used in their ordinary and usual sense, and with the meaning commonly attributable to them. To the general understanding and with the common meaning usually attached to such descriptive terms, bonds, mortgages, and certificates of stock are regarded as property. By state and federal statutes they are often treated

as .property, not as mere evidences of the interest which they represent. In *Blackstone* v. *Miller,* 188 U. S. 189, 206, this court held that a deposit by a citizen of Illinois in a trust company in the City of New York was subject to the transfer tax of the State of New York and said: 'There is no conflict between our views and the point decided in the case reported under the name of *State Tax on Foreign Held Bonds,* 15 Wall. 300. The taxation in that case was on the interest on bonds held out of the State. Bonds and negotiable instruments are more than merely evidences of debt. The debt is inseparable from the paper which declares and constitutes it, by a tradition which comes down from more archaic conditions. *Bacon* v. *Hooker,* 177 Massachusetts, 335, 337.' The Court of Appeals of New York, recognizing the same principle, treated such instruments as property in *People ex. rel. Jefferson* v. *Smith,* 88 N. Y. 576, 585: 'It is clear from the statutes referred to and the authorities cited and from the understanding of business men in commercial transactions, as well as of jurists and legislators, that mortgages, bonds, bills and notes have for many purposes come to be regarded as property and not as the mere evidences of debts, and that they may thus have a *situs* at the place where they are found like other visible, tangible chattels.' We have no doubt that the securities, herein involved, are property. Are they property within the United States? It is insisted that the maxim *mobilia sequuntur personam* applies in this instance and that the situs of the property was at the domicile of the owner in France. But this court has frequently declared that the maxim, a fiction at most, must yield to the facts and circumstances of cases which require it; and that notes, bonds and mortgages may acquire a situs at a place other than the domicile of the owner, and be there reached by the taxing authority. It is only necessary to refer to some of the decisions of

this court." (Citing Cases) "Shares of stock in national banks, this court has held, for the purpose of taxation may be separated from the domicile of the owner, and taxed at the place where held. *Tappan* v. *Merchants' National Bank,* 19 Wall. 490. In the case under consideration the stocks and bonds were those of corporations organized under the laws of the United States, and the bonds and mortgages were secured upon property in Pennsylvania. The certificates of stock, the bonds and mortgages were in the Pennsylvania Company's offices in Philadelphia. Not only is this so, but the stocks, bonds and mortgages were held under a power of attorney which gave authority to the agent to sell, assign, or transfer any of them, and to invest and reinvest the proceeds of such sales as it might deem best in the management of the business and affairs of the principal. It is difficult to conceive how property could be more completely localized in the United States. There can be no question of the power of Congress to tax the income from such securities. Thus situated and held, and with the authority given to the local agent over them, we think the income derived is clearly from property within the United States within the meaning of Congress as expressed in the statute under consideration."

It will be observed that the *DeGanay* case presents the question before us on its obverse side, that is to say, the taxpayer, Emily DeGanay, who was a resident and citizen of France, sought to escape the tax imposed by the Federal statute by invoking the doctrine embodied in the maxim *mobilia sequuntur personam,* whereas, in the instant case, the Territory invokes the maxim for the purpose of bringing the taxpayer's property within the *situs* of her domicile and thus subjecting it to the tax imposed by our statute. We think, however, that the difference in the situation of the parties in the two cases does not

276

destroy or weaken the influence of the *DeGanay* case.
The subject of inquiry in the *DeGanay* case was the same
as that in the instant case, namely, *the situs of the tax-
payer's property*. In the *DeGanay* case it was held to be
in Pennsylvania and therefore the tax imposed by the
Federal statute on the income derived from it must be
paid. Under agreed facts that are so similar to those in
the *DeGanay* case as to be indistinguishable from them we
·feel bound by that case to hold that the *situs* of the tax-
payer's property is New York and therefore she is not re-
quired by our statute to pay the tax on the income derived
from it. It cannot be said to have at one and the same
time a dual *situs*—one actual and the other fictional. If
it is so permanently located and controlled in New York
as to give it a business *situs* there it would be a manifest
legal solecism to say it also had a constructive *situs* in
Hawaii under the maxim *mobilia sequuntur personam*.
To so hold would, if New York had an income tax statute
identical with ours relating to nonresidents, subject the
taxpayer to a tax there on the theory that her property
was actually located in that jurisdiction and also subject
her to a tax in Hawaii on the theory that under the maxim
*mobilia sequuntur personam* her property was located in
this jurisdiction—the place of her domicile. It was in
condemnation of such an unjust and irrational result that
the Supreme Court of the United States said in *Safe
Deposit & Trust Co.* v. *Virginia*, 280 U. S. 83, 92: "Ordi-
narily this court recognizes that the fiction of *mobilia
sequuntur personam* may be applied in order to determine
the situs of intangible personal property for taxation.
*Blodgett* v. *Silberman*, 277 U. S. 1. But the general rule
must yield to established fact of legal ownership, actual
presence and control elsewhere, and ought not to be ap-
plied if so to do would result in inescapable and patent
injustice, whether through double taxation or otherwise."

The court also said (p. 94) : "It would be unfortunate, perhaps amazing, if a legal fiction originally invented to prevent personalty from escaping just taxation, should compel us to accept the irrational view that the same securities were within two States at the same instant and because of this to uphold a double and oppressive assessment."

Our attention is drawn to a very recent case (*Farmers' Loan & Trust Co.* v. *Minnesota*) decided by the Supreme Court of the United States on January 6, 1930, and appearing in the advance sheets but not yet published in the official reports. We refer to this case not because on its facts it is similar to the case at bar but because in the course of its opinion the court made some observations which we think are both significant and pertinent. It appears from the statement of facts that Henry R. Taylor, while domiciled and residing in New York, died testate on December 4, 1925. He had long owned and kept within that State negotiable bonds and certificates of indebtedness issued by the State of Minnesota and the cities of Minneapolis and St. Paul, worth about $300,000. Some of these were registered, others were payable to bearer. None had any connection with the business carried on by or for the decedent in Minnesota. All passed under his will, which was probated in New York. There also his estate was administered and a tax exacted upon the testamentary transfer. Minnesota assessed an inheritance tax upon the same transfer. Her supreme court approved this and upheld the validity of the authorizing statute, not, of course, on the theory of the doctrine of *mobilia sequuntur personam,* but on the theory that the bonds and certificates of indebtedness were the obligations of Minnesota and her municipal corporations and therefore the owner must invoke the laws of that State to enforce them. In reversing the Minnesota court the Supreme Court of

the United States said: "Four different views concerning the situs for taxation of negotiable public obligations have been advanced. One fixes this at the domicile of the owner; another at the debtor's domicile; a third at the place where the instruments are found—physically present; and the fourth within the jurisdiction where the owner has caused them to become integral parts of a localized business. If each State can adopt any one of these and tax accordingly, obviously, the same bonds may be declared present for taxation in two, or three, or four places at the same moment. Such a startling possibility suggests a wrong premise." From this language we think the conclusion is inescapable that the court intended to express its disapproval of any view of the law under which intangible securities could at the same moment have for taxation purposes a dual *situs*.

We infer from the tax assessor's brief and from what was said in his behalf in oral argument that he thinks *Ewa Plantation* v. *Wilder, supra,* is more nearly like the instant case than is *DeGanay* v. *Lederer, supra,* and therefore should control. We cannot agree with this. The *Ewa* case, in which the rule expressed in *mobilia sequuntur personam* was applied, is so dissimilar in its facts to the instant case that it cannot be regarded as authority in support of the tax assessor's contention. In the *Ewa* case the agent of the taxpayer at San Francisco had authority only to purchase and hold mainland securities and to place the income derived from them on deposit to be drawn upon by the taxpayer at its domicile as it was needed for the payment of the current expenses of its plantation and for the payment of dividends upon its stock. The taxpayer's agent in that case had no such plenary powers over the property of its principal as has the taxpayer's agent in the instant case over the property of his principal. It was on this ground that the *Ewa* case was distinguished by this

court and by the court of appeals of the ninth circuit (289 Fed. 664) from the *DeGanay* case, which case, as we have observed, is strikingly similar in its facts to the instant case. Speaking on this subject this court said (p. 311) : "It is worthy of note that in the *DeGanay* case the court emphasized the fact that the stocks, bonds and mortgages were held in Pennsylvania under a power of attorney which gave authority to the agent to sell, assign and transfer any of them and to invest and reinvest the proceeds of sale as it might deem best in the management of the business and affairs of the principal. No such situation exists in the cases at bar. The mainland agents of the taxpayers were apparently clothed only with authority to purchase and hold the securities and as the income thereon was received to place the same to the credit of their principals to be drawn upon from time to time as money was required for the payment of the expenses of their plantations and dividends upon their stock. These securities therefore were not localized nor did they enjoy a business situs such as is referred to in the *DeGanay* case." Speaking on the same subject the court of appeals said (p. 669) : "In that case" (referring to the *DeGanay* case) "the significant facts were that the stocks and bonds were in the hands of a local agent empowered to sell and dispose of them or any of them according to his own judgment, to reinvest at his discretion, to hold the same for the owner's account, and to represent the owner and manage generally the owner's business affairs. In the case at bar there was no such localization of the property. The agent at San Francisco had authority only to purchase and hold the securities and to place the income on deposit, to be drawn upon, not by Castle & Cooke at Honolulu, but by the plaintiff in error at its domicile, as required for the payment of the current expenses of its plantation and dividends upon its stock."

Neither can we agree with the tax assessor that we should decide the present case in accordance with the decision in *Maguire* v. *Trefry*, 253 U. S. 12. In that case a citizen of Massachusetts was the beneficiary of a trust whereby she was to receive income from securities located in Philadelphia. It was held that under the maxim *mobilia sequuntur personam* the income was taxable in the State of the beneficiary's domicile. In the course of its opinion the court said (pp. 15, 16) : "At the last term we held in *DeGanay* v. *Lederer*, 250 U. S. 376, that stocks and bonds issued by domestic corporations, and mortgages secured on domestic real estate, although owned by an alien nonresident, but in the hands of an agent in this country with authority to deal with them were subject to the Income Tax Law of October 3, 1913, 38 Stat. 166. In the present case we are not dealing with the right to tax securities which have acquired a local situs, but are concerned with the right of the State to tax the beneficiary of a trust at her residence, although the trust itself may be created and administered under the laws of another State."

Unlike the *Maguire* case, and unlike the *Ewa* case to which the *Maguire* case was applied, but exactly like the *DeGanay* case, we are dealing with the right of the tax assessor under our statute to impose an income tax on a taxpayer whose property consists of intangible securities having a business *situs* in a jurisdiction foreign to that in which she is domiciled. The distinction between the *Maguire* case and the *DeGanay* case is clearly pointed out in the opinion rendered in the *Maguire* case. In that opinion there is no suggestion that the *DeGanay* case was wrongly decided. In other words, there is no suggestion that intangible securities by their very nature are incapable of acquiring a *situs* other than the domicile of the owner. That they may acquire such *situs* is recognized

in *Farmers' Loan & Trust Co.* v. *Minnesota, supra.* There the court said: "*New Orleans* v. *Stempel,* 175 U. S. 309, *Bristol* v. *Washington County,* 177 U. S. 133, *Liverpool, etc., Ins. Co.* v. *Orleans Assessors,* 221 U. S. 346, recognize the principle that choses in action may acquire a situs for taxation other than at the domicile of their owner if they have become integral parts of some local business."

In *Safe Deposit & Trust Co.* v. *Virginia, supra,* the court thought, as shown by the portions of the opinion herein previously quoted, that it would be an unjust rule that would permit intangible property to be twice taxed on inconsistent theories. In that case the State of Virginia levied a property tax on the corpus of a trust estate which consisted of stocks and bonds of sundry corporations which were definitely and permanently located and under the control of a trustee in the State of Maryland and were there taxable. The supreme court of Virginia held that inasmuch as the beneficiaries of the estate lived in Virginia the property, consisting as it did of intangible securities, was, under the maxim *mobilia sequuntur personam,* likewise located in Virginia and was there taxable. The Supreme Court of the United States disagreed with this conclusion and reversed the Virginia court, holding that the corpus of the estate having its actual *situs* in Maryland could not at the same time, under the maxim *mobilia sequuntur personam,* have a *situs* in Virginia and that, Virginia having no constitutional authority to lay a tax on property located outside its own borders, the assessment in question was invalid. The case therefore is not authority for the tax assessor's contention that under the doctrine of *mobilia sequuntur personam* the taxpayer's property in the instant case is to be regarded as having its *situs* in the Territory of her domicile.

*Blodgett* v. *Silberman,* 277 U. S. 1, also relied on by the tax assessor, is not in conflict with this view. In that

case the court was dealing with the right of the State of Connecticut to impose a succession tax on the transfer of intangible property (choses in action) that had its actual physical location beyond the domicile of the decedent. The court, applying the rule expressed in the maxim *mobilia sequuntur personam*, held that the *situs* of the property was at the domicile of the owner and therefore the tax must be paid. In that case, however, the property in question was not under the control of an agent at the place of its location as was the property in the *DeGanay* case and as is the property in the instant case. We think this fact alone is sufficient to distinguish the *Blodgett* case from the present case, as it was sufficient in the opinion of this court and in the opinion of the court of appeals to distinguish the *Ewa* case from the *DeGanay* case. The *DeGanay* case was not even mentioned in the *Blodgett* case and no doubt for the reason that the court considered that it was dealing with an entirely different situation.

The *DeGanay* case has never been overruled and we therefore consider it binding on this court. A judgment in favor of the taxpayer will be signed upon presentation.

*H. L. Wrenn* and *A. G. M. Robertson* (*Prosser, Anderson & Marx* and *Robertson & Castle* on the briefs) for the taxpayer.

*H. T. Kay*, First Deputy Attorney General (*H. R. Hewitt*, Attorney General, with him on the briefs), for the tax assessor.

### DISSENTING OPINION OF PARSONS, J.

I respectfully dissent. In my opinion the legislature of the Territory not only "has the power to tax the income of residents received from all sources," as conceded by counsel for the taxpayer, but, contrary to counsel's claim,

it has exercised that power in the enactment of section 1388, R. L. 1925.

The majority withholds, as unnecessary in the premises, any expression of opinion as to whether counsel's concession of power above referred to is proper or improper. The theory of this dissent requires a preliminary statement of views and supporting citations upon that point.

In discussing the power of Congress or the power of the state or territorial legislatures in income tax matters it is necessary to keep in mind the twofold theory of jurisdiction in such matters, which is that in certain instances the jurisdiction of the government and the courts is over the person of the taxpayer, while in others it is over the income or property taxed. Quoting from *Shaffer* v. *Carter,* 252 U. S. 37, 49, 50: "Governmental jurisdiction in matters of taxation, as in the exercise of the judicial function, depends upon the power to enforce the mandate of the State by action taken within its borders, either *in personam* or *in rem* according to the circumstances of the case, as by arrest of the person, seizure of goods or lands, garnishment of credits, sequestration of rents and profits, forfeiture of franchise, or the like. * * * In our system of government the States have general dominion, and, saving as restricted by particular provisions of the Federal Constitution, complete dominion over all persons, property, and business transactions within their borders; they assume and perform the duty of preserving and protecting all such persons, property, and business, and, in consequence, have the power normally pertaining to governments to resort to all reasonable forms of taxation in order to defray the governmental expenses. Certainly they are not restricted to property taxation, nor to any particular form of excises. In well-ordered society, property has value chiefly for what it is capable of producing, and the activities of mankind are devoted largely to mak-

ing recurrent gains from the use and development of property, from tillage, mining, manufacture, from the employment of human skill and labor, or from a combination of some of these; gains capable of being devoted to their support, and the surplus accumulated as an increase of capital. That the State, from whose laws property and business and industry derive the protection and security without which production and gainful occupation would be impossible, is debarred from exacting a share of those gains in the form of income taxes for the support of the government, is a proposition so wholly inconsistent with fundamental principles as to be refuted by its mere statement. That it may tax the land but not the crop, the tree but not the fruit, the mine or well but not the product, the business but not the profit derived from it, is wholly inadmissible. Income taxes are a recognized method of distributing the burdens of government, favored because requiring contributions from those who realize current pecuniary benefits under the protection of the government, and because the tax may be readily proportioned to their ability to pay. Taxes of this character were imposed by several of the States at or shortly after the adoption of the Federal Constitution. * * * The rights of the several States to exercise the widest liberty with respect to the imposition of the internal taxes always has been recognized in the decisions of this court."

In *Maguire* v. *Trefry,* 253 U. S. 12, it was held, affirming 230 Mass. 503, that (quoting from the syllabus) "the income received by the beneficiary from a trust estate consisting of bonds and equipment certificates held and administered by the trustee in another State, is taxable by the State of the beneficiary's domicile." In the case last above cited the contention of the plaintiff in error was "that the tax was direct on the property producing the income; personal intangible property held in trust and

personal tangible property held by a trustee who had leased it on the equipment trust plan had its *situs* where it and the trustee were; the domicile of the *cestui* in Massachusetts did not authorize the taxation over again of the property itself."

Answering this contention, the Supreme Court of the United States quotes with approval from the opinion of the supreme judicial court of Massachusetts in the same case as follows: "The income tax is measured by reference to the riches of the person taxed actually made available to him for valuable use during a given period. It establishes a basis of taxation directly proportioned to ability to bear the burden. It is founded upon the protection afforded to the recipient of the income by the government of the Commonwealth of his residence in his person, in his right to receive the income and in his enjoyment of the income when in his possession. That government provides for him all the advantages of living in safety and in freedom and of being protected by law. It gives security to life, liberty and the other privileges of dwelling in a civilized community. It exacts in return a contribution to the support of that government, measured by and based upon the income, in the fruition of which it defends him from unjust interference. It is true of the present tax, as was said by Chief Justice Shaw in *Bates* v. *Boston,* 5 Cush. 93, at page 99, 'The assessment does not touch the fund, or control it; nor does it interfere with the trustee in the exercise of his proper duties; nor call him, nor hold him, to any accountability. It affects only the income, after it has been paid by the trustee' to the beneficiary."

Differentiating the principles involved in the case before it from those involved in *DeGanay* v. *Lederer* cited in the majority opinion in the case at bar, the opinion in *Maguire* v. *Trefry, supra,* continues: "At the last term we

held in *DeGanay* v. *Lederer*, 250 U. S. 376, that stocks and bonds issued by domestic corporations and mortgages secured on domestic real estate, although owned by an alien nonresident but in the hands of an agent in this country with authority to deal with them, were subject to the Income Tax Law of October 3, 1913, 38 Stat. 166. In the present case we are not dealing with the right to tax securities which have acquired a local situs, but are concerned with the right of the State to tax the beneficiary of a trust at her residence, although the trust itself may be created and administered under the laws of another State."

In other words, in *DeGanay* v. *Lederer* the court was concerned only with the question of governmental jurisdiction in income taxation matters dependent upon its power to enforce its mandate within its borders *in rem*, while in *Maguire* v. *Trefry*, it was concerned with the question of such jurisdiction dependent upon its powers *in personam*. In *DeGanay* v. *Lederer, supra*, the question certified was as to the taxability or nontaxability of income from "property owned * * * in the United States by persons residing elsewhere" under the provisions of the Federal Income Tax Law of 1913. It will be noted that the section of the law containing the foregoing provision contains another provision, to-wit: "That there shall be levied, assessed, collected and paid annually upon the entire net income arising or accruing from all sources in the preceding calendar year to every citizen of the United States, whether residing at home or abroad, and to every person residing in the United States, though not a citizen thereof, a tax," etc. Under the provision last above quoted the Federal government is still collecting taxes upon the incomes of residents derived from sources without the United States. Article 13, Treasury Income Tax Regulations 74, provides in part as follows: "In general,

citizens of the United States, wherever resident, are liable to the tax, and it makes no difference that they may own no assets within the United States and may receive no income from sources within the United States. Every resident alien individual is liable to the tax, even though his income is wholly from sources outside the United States." *DeGanay* v. *Lederer* is not authority to the effect that such incomes cannot be taxed in this country, and, so far as I have been able to find, there is no such authority.

Quoting from Holmes on Federal Income Tax (6th Ed.), Par. 25, p. 30: "The theory upon which the income tax is imposed seems to be twofold. The law imposes the tax upon the net income of all persons within its jurisdiction, regardless of the source of such income, and upon all income arising from sources within the United States, regardless of whether or not the United States has jurisdiction of the recipient. The tax has been defined as a tax on the person, measured by his ability to pay his net income, and as a tax on the income itself. As a matter of fact, it is both. The government claims personal jurisdiction over all aliens who reside within the borders of the United States. Hence, as to citizens and resident aliens, the tax is imposed on income from all sources whether arising in this country or in a foreign country. No jurisdiction can be claimed over the persons of nonresident aliens but in so far as their income is received from sources within this country, it is taxed on the theory that the government has jurisdiction over the income, grants protection to the creation of such income, and is, therefore, entitled to a share thereof to defray the expense of government. The fact that a person is taxable in foreign countries on all or part of his income does not relieve him from tax liability on the same income in this country, although he is entitled to credit in certain cases against his tax liabil-

ity in this country by reason of the payment of taxes to foreign countries."

In the footnotes of the foregoing text are cited *Brady* v. *Anderson,* 240 Fed. 665, 667, to the following effect: "In our opinion the tax is against the citizens and residents of the United States personally; they are chargeable in respect to income received by them;" and *State ex rel. Sallie F. Moon Company* v. *Wisconsin Tax Commission,* 166 Wis. 287, 290, 163 N. W. 639, 640, as follows: "It is the recipient of the income that is taxed, not his property; and the vital question in each case is, Has the person sought to be taxed received an income during the tax year? If so, such income, unless specifically exempted, is subject to a tax though the property out of which it is paid may have been exempt from an income tax in the hands of the payor. It is the relation that exists between the person sought to be taxed and the specific property claimed as income to him that determines whether there shall be a tax. If the person sought to be taxed is the recipient during the tax year of such specific property as income in its ordinary significance, then the person is taxed. But the tax is upon the right or ability to produce, create, receive and enjoy, and not upon specific property. * * * In the ordinary acceptation of the term this may be said to be a tax upon income as the statute denominates it. But the tax does not seek to reach property or an interest in property as such. It is a burden laid upon the recipient of an income."

The legislature thus having the power to tax the income of residents from property the *situs* of which is either within or without the Territory, there remains to be discussed the dissenting view hereinabove expressed that it has imposed such a tax on the income of individuals by the provisions of section 1388, R. L. 1925.

Section 1388 provides in part as follows: "There shall

be levied, assessed, collected and paid annually upon the gains, profits and income received by every individual residing in the Territory, from all property owned, and every business, trade, profession, employment or vocation carried on in the Territory, and by every person residing without the Territory, from all property owned, and every business, trade, profession, employment or vocation carried on in the Territory * * * a tax," etc. Section 1389, R. L. 1925, providing for the taxation of the incomes of corporations, contains similar terms. It provides in part that "there shall be levied, assessed, collected and paid annually, except as hereinafter provided, a tax of five per centum on the net profit or income above actual operating and business expenses derived during such taxation period, from all property owned, and every business, trade, employment or vocation, carried on in the Territory, of all corporations doing business for profit in the Territory, no matter where created and organized." Under the last named section this court held, in *Ewa Plantation* v. *Wilder*, 26 Haw. 299, affirmed by the ninth circuit court of appeals, 289 Fed. 664, in effect and among other things, that the income from bonds and stocks of mainland municipalities and corporations and bank credits in mainland banks held by mainland agents of a local taxpayer is taxable here—this, however, upon the theory that their *situs* is here under the maxim *mobilia sequuntur personam.* With the foregoing theory and with the differentiation in the majority opinion of the facts in the *Ewa* case and the facts in the case at bar, justifying a different conclusion in the latter case as to the *situs* of the personal property, the income from which is sought to be taxed, I am not presently concerned. In the *Ewa* case counsel for the Territory conceded that the phrase "owned in Hawaii" as employed in the statute then under consideration "must be taken as referring to the property and not the owner

and the final form of the question is, 'Are these bonds and deposits property in Hawaii,' and that the case stands as though the statute read 'income from property in Hawaii owned by the taxpayer.' " Said the court: "We are not as ready as counsel to accept this construction of the meaning of the statute. It seems to us that it could be strongly argued that the phrase 'property owned in Hawaii' has reference to the place of ownership and not to the location of the property. We are referred to the rule that in the construction of a statute the language employed should be taken in its common and usual signification and we are reminded that if a person were asked, 'What property do you own in the Territory?' he would not in answering enumerate bonds and notes of foreign or mainland corporations or deposits in foreign or mainland banks. This may be true, but on the other hand if the San Francisco agents of these corporations were asked in respect to the property in question, 'Where are these bonds, notes or bank credits owned?' the answer obviously would be, 'In the Territory of Hawaii,' and that answer would be entirely correct. We will not pursue this discussion further for the reason that even adopting the construction placed on the statute by the parties the result will be the same." The question, therefore, of the meaning of the words "income * * * from all property owned * * * in the Territory" in their context, was left unanswered by the *Ewa* case and remained open for future decision.

It seemed to the court, as quoted above, that "it could be strongly argued that the phrase 'property owned in Hawaii' has reference to the place of ownership and not to the location of the property." It seems to me that the words above quoted from the statute do bear the interpretation suggested by the court. This is not to say that the words named refer necessarily and in all instances to

the place of residence of the owner. I agree with the majority in the present case, and for the reasons expressed in its opinion, that such an interpretation is untenable. But the opinion in the former case conveys the suggestion that the words may have a flexible meaning, dependent in each instance upon their context, and in my view they do have such a meaning. It is significant in this connection that the tax imposed by the statute is in express terms a tax upon *income* and not upon the property which produces such income; that in the phase under discussion it is a tax upon income received by every individual residing in the Territory, from all property owned—not necessarily situated—in the Territory. In this connection it should be borne in mind that "the word 'property,' although in common parlance frequently applied to a tract of land or a chattel, in its legal signification means only the *rights* of the owner in relation to it. It denotes a right over a determinate thing." Andrews Am. Law, Sec. 96, quoted with approval by this court in *Carter* v. *Territory,* 14 Haw. 465, 474.

The words "gains, profits and income" are defined by section 1390, R. L. 1925. After setting forth certain specific things which they shall include, the statute continues "and all other gains, profits and income derived from any source whatsoever during said taxation period."

The view above expressed is strengthened by examination of other parts of the statute and of statutes *in pari materia.* Section 1388, R. L. 1925, provides for a tax upon the income of every individual residing in the Territory, not only from all property owned therein but also from every business, trade, profession, employment or vocation carried on therein. This I do not interpret to mean that the physical assets of a business owned, directed and controlled here and whose income is received here must be located in Hawaii and its actual transactions take place

in Hawaii in order to bring the income of the owner of such business within the provisions of the statute. The same may be said of the similar provisions hereinabove quoted of section 1389 with reference to corporation incomes derived from business "carried on in the Territory." Of persuasive influence in bringing about this conclusion is the reasoning in certain English cases cited in the case notes in Ann. Cas. 1918A, begining on page 426. I quote from the notes above referred to: "In *Apthorpe* v. *Peter Schoenhofen Brewing Co.,* 80 L. T. N. S. (Eng.) 395, it appeared that an English company owned a majority of the shares in an American brewing company. The larger number of the English company's shares were owned in the United States but the larger number of shareholders resided in England. The business was carried on and the profits were earned in America, and although the American directors managed the brewery, they did so under the authority delegated to them by the English directors. It was held that the English company must pay an income tax on 'the larger amount' of profits, although only a part thereof was remitted to England. Collins, L. J., said: 'We have on the face of this case a finding that the business which is carried on in America is the business of the respondent company. * * * In my judgment, there is no incompatibility between a company holding shares in another company and at the same time carrying on a business analogous to that carried on by the other company. Among the objects for which the English company was formed, mentioned in paragraph 3 of the memorandum of association, are not only 'to acquire all or any of the shares of the Peter Schoenhofen Brewing Company,' but also 'to carry on business as brewers, distillers,' and so on. There is a finding in the case that the English company carries on business as brewers at Chicago, and they also carry on business in England. Then comes the question whether

this business is not one and the same business, carried on partly in England and partly in Chicago. The finding in paragraph 7 of the case seems to me to be absolutely conclusive on this point. It is that 'All the books of account and other documents relating to the working and carrying on of the brewery, as well as the cash locally required, are kept, received, and dealt with at Chicago; but reports, letters, papers, and other documents, sufficient to enable the respondent company to judge of the manner in which the managers at the brewery carry out and undertake the necessary control and direction, are from time to time transmitted to and received in England by the respondent company's directors.' Then it is also stated: 'The board of directors meet in England and have power to dismiss any or all of the managers, officials, and others carrying on the business in Chicago.' The company therefore resides in England, has its office in England, carries on business by its directors in England, deals with the routine of the company so far as it has to be dealt with in England, and directs, as in terms it has been found to do, through a committee of management appointed by it, or for it, a large trade in Chicago. * * * One central factor in this question is whether or not the ultimate tribunal of appeal, the ultimate controlling power, is in England. If it is in England, as in the present case, can it be said that a company whose business abroad is carried on under its paramount control and supervision in England is not partly carried on in England? In my judgment, it cannot. On the facts of this case it seems to me absolutely clear that the business of the company is carried on partly in England and partly in America, and the company is therefore liable to pay income tax on the larger amount.'"

In *San Paulo R. Co.* v. *Carter* (1896) A. C. 31, affirming 1 Q. B. 580, 3 Tax Cas. 344, cited in the same case note, a similar construction was placed upon the provi-

sion regarding the carrying on of business in the United Kingdom. In that case Lord Davey said: "I do not attach any importance to the facts of the railway and business belonging to a corporation and not to an individual, except that in the case of an English joint stock company formed for the purpose of carrying on a particular business it is perhaps easier to say where is the seat of administration and direction." The same view as to the doing of business in England was adopted in *St. Louis Breweries* v. *Apthorpe*, 79 L. T. N. S. (Eng.) 551, and *Bartholomay Brewing Co.* v. *Wyatt*, 2 Q. B. 499, 62 L. J. Q. B. 525, 69 L. T. N. S. 561, 42 W. R. 173, and in other cases cited in the voluminous notes above referred to.

In *Peter Schoenhofen Brewing Co., supra,* in *San Paulo R. Co.* v. *Carter, supra,* and in other cases cited in the notes above referred to, the English courts were also concerned with the question as to whether the companies carrying on business in England in the sense therein applied were taxable upon the basis of the whole of their profits or only the portion thereof remitted to England. The two cases, titles of which are given above, held that the respective companies were taxable in the larger amounts. Other cases cited in said notes hold that the English companies in circumstances set forth in said notes are liable to income tax only on profits earned abroad and transmitted to the United Kingdom. The question last above stated, applied to the facts in this case, has not been submitted or suggested by counsel and therefore no opinion is expressed as to how it should be answered under our own statutes.

Under the agreed facts, for the reasons above set forth, I believe that judgment should be for the tax assessor.