HAWAIIAN CANNERIES COMPANY, LTD., *v.* DEPEND-
ENTS OF CLARA KALI, DECEASED, AND INDUS-
TRIAL ACCIDENT BOARD OF THE COUNTY OF
KAUAI, TERRITORY OF HAWAII.

No. 4061.

ARGUED DECEMBER 17, 1958.                    DECIDED MARCH 12, 1959.

RICE, C. J., STAINBACK AND MARUMOTO, JJ.

This case is before us on cross appeals from a judgment of the circuit court of the fifth circuit on a claim for death benefit under the Workmen's Compensation Law, R.L.H. 1945, Ch. 77. Claimants are Robert Kali and Lei Kali, parents of Clara Kali. Clara was injured in an industrial accident on September 27, 1955, and died two days later. At the time of the accident, she was an employee of Hawaiian Canneries Company, Ltd. The claim was based on alleged partial dependency of claimants upon Clara. The court ordered the employer to pay to claimants a compensation of $6.75 per week, beginning September 29, 1955, and ending on the 20th anniversary of Clara's birth. Clara was born on July 28, 1936. So, the compensation was payable until July 28, 1956. The award was based on the following determinations: (1) that claimants were partially dependent upon Clara; (2) that claimants' partial dependency continued only during Clara's minority; and (3) that Clara's average weekly wages were $5.46. Although the court found that Clara's average weekly wages were $5.46, it ordered the payment of a weekly compensation of $6.75 because under R.L.H. 1945, § 4411, partially dependent parents are entitled to death benefit payments of 25 per cent of the average weekly wages of the deceased child and under R.L.H. 1945, § 4414, in computing death benefits, the average weekly wages of the deceased employee are considered to be not less than $27.00.

The employer appealed from the first determination. Claimants and Industrial Accident Board of the County of Kauai appealed from the other determinations.

The following facts were established in the circuit court by stipulations and uncontroverted testimony:

*Facts relating to Clara's employment.* Only the facts relating to Clara's employment during the period of 12 months immediately preceding her injury will be stated. Facts of Clara's employment before that period are not material to this case. During the mentioned period, the only remunerative employment that Clara had was with Hawaiian Canneries. Her counsel so stipulated. Although Robert Kali testified that Clara occasionally did baby sitting for neighbors, there is no evidence that she had any income from such

service, and the stipulation controls. Clara worked for Hawaiian Canneries for three months immediately before her death. She earned $283.84, as follows: $126.54 in July, $34.10 in August, and $123.20 in September. She was a seasonal worker. She was first employed in the cannery. Later, after there was no longer any work in the cannery, she was transferred to field work. At the time of the accident, she was employed in field work. She worked 8 hours per day and 5½ days per week. Her wage rate was $1.10 per hour.

*Facts relating to claimants' partial dependency on Clara.* During the period of 12 months immediately preceding Clara's injury, claimants and their six children, of whom Clara was the oldest, constituted a single family unit. It was stipulated that the living expenses of the family averaged $364 per month. Thus, the annual cost of maintaining the family was $4,368. But the total earnings of the family in the year in question were only $3,777.92. They were earned as follows: Robert, $2,433.64; Lei, $409.56; Clara, $283.84; Janet, $351.07, and Winnifred, $299.81. Janet and Winnifred are Clara's younger sisters. In each month that she had any income, Clara retained approximately $20 for her personal use, and contributed the balance to the family pot.

*Facts relating to the employer's employment situation.* Hawaiian Canneries is engaged in the business of growing and canning pineapples. It employs regular and seasonal employees in the field, and regular, intermittent, and seasonal employees in the cannery. Regular employees are hired on year-round basis and are expected to work on every scheduled work day. Intermittent employees are hired to work in the cannery during the peak canning season and on other days when the cannery is in operation and also when warehouse work is available. Seasonal employees are hired to work during the peak season. The peak season covers a period of 14 consecutive weeks or less during the summer months. In the cannery, the season begins before July 1. In the field it may start one or two weeks later. Normally, the seasonal employees do not have any other remunerative employment.

Claimants are entitled to death benefit only if they were "actu-

ally dependent, wholly or partially, upon the deceased" at the time of Clara's injury. (R.L.H. 1945, § 4412.)

Actual dependency in workmen's compensation cases does not mean dependency of the claimant upon the deceased for the bare necessities of life. It is established by a showing that the claimant looked to the contribution of the deceased for the maintenance of his accustomed standard of living. (2 Larson's Workmen's Compensation Law, § 63.00; 58 Am. Jur., Workmen's Compensation, § 163; 99 C.J.S., Workmen's Compensation, § 134.)

The evidence in this case shows that claimants depended upon Clara's contribution to provide the living expenses for themselves and their children, at the level of their accustomed standard of living, if not at the level of subsistence. In the absence of any complicating factor, there would not have been any question as to claimants' partial dependency on Clara. A question as to dependency has been raised in this case because the stipulated living expenses of the Kali family included Clara's living expenses other than the sums that she retained for her use out of her earnings.

According to the view taken by the circuit court, Clara's share of the family living expenses exceeded her contribution. The court did not set forth the basis of its conclusion except to state that "on the basis of her earnings, it took more to maintain Clara than the amount she contributed to the family, so how could there be any support and maintenance on the part of Clara Kali if it took more to support her than the amount she was contributing?" It apparently reached such conclusion by dividing the living expenses of the Kali family by 8, the number of members in the family, and comparing the result with Clara's average weekly wages. The stipulated monthly expenses of $364 reduced to weekly basis is $84 and one-eighth of the latter is $10.50. As previously stated, the court determined Clara's average weekly wages to be $5.46.

The court, nevertheless, held that claimants were partially dependent upon Clara on the basis of the statement in *Air Castle, Inc.* v. *Industrial Commission,* 394 Ill. 62, 67 N.E. (2d) 177, that "A child contributes to the support of his parents, within the purview of the Workmen's Compensation Act, when he contributes a substantial sum to the support of the family, although this sum is less than the actual cost of his support and maintenance

where the child is a minor or is in a position to demand legal support, as here, from his parents." However, it limited the payment of the compensation to the period that Clara would have been a minor had she lived. The court explained the reason for the limitation as follows: "Under the theory upon which the Court decided the case, had Clara Kali been an adult, the Court would have ruled there was no dependency. The Court proceeded on the basis of Clara Kali being at the time an unemancipated minor. Had she been 20 or over, the Court would have ruled otherwise. The Court would have ruled there was no dependency in this case."

The employer contends that the circuit court erred in determining that claimants were partially dependent upon Clara on the basis of the statement in *Air Castle, Inc.* v. *Industrial Commission.* It says that the statement represents the minority, not the majority, rule.

We think that *Air Castle, Inc.* v. *Industrial Commission* supports the finding of claimants' partial dependency on Clara, but not for the reason set forth in the statement quoted by the circuit court. There was no finding in that case that the deceased child's share of the family living expenses exceeded his contribution. The precise holding in that case was that where a minor child turned over his earnings to his mother and the mother commingled such earnings with other family funds from which she paid the usual household expenses, including the cost of the child's necessary clothing, the finding of the industrial commission that the parents were partially dependent on the child should be confirmed. The court stated: "Defendant in error argues that the contributions made by William did not exceed the cost of his clothes and spending money allotted him, and that his contributions, therefore, could not have been used and relied upon by his parents in defraying family expenses for the reason no money was left from his contributions which could be devoted to this purpose. The argument is fallacious. Edward LaTour turned over money to his wife, Anna, and she also received the wages of their son William. The funds were commingled, and it cannot be said that William's earnings were used solely to meet his own personal needs. As his mother testified, she paid for his winter coat and other articles of clothing

'from the money we had all together and we used this money as it came.' The statute does not require that applicants claiming dependency or partial dependency be held to the degree of accounting and bookkeeping contended for by defendant in error. Manifestly, clothing for William was as much a necessary family expense as lodging and food."

Here, as in *Air Castle, Inc.* v. *Industrial Commission,* the deceased child's contribution was commingled with the earnings of the other members of the family and used to pay the family living expenses. There is no basis, either in law or in the evidence adduced in the case, for saying that Clara's share of the family living expenses was one-eighth because she was one of eight members of the family, or that her share was more or less than the other members of the family. The only pertinent evidence is that, at the time of Clara's injury, claimants did not have sufficient income to meet all of the family living expenses and depended upon Clara's contribution to pay a part of such expenses. In the circumstance, the circuit court did not err in finding that claimants were partially dependent upon Clara at the time of her injury.

The employer says that the decisions of the leading industrial states of New York, Pennsylvania and Massachusetts hold that where the child pays to his parents no more than his actual living expenses, the parents may not claim dependency, and cites *Darcy* v. *Loew's, Inc.,* 141 N.Y.S. (2d) 864; *Orosky* v. *American Window Glass Co.,* 162 Pa. Super, 195, 56 A. (2d) 384; and *Hoehn's Case,* 326 Mass. 509, 95 N.E. (2d) 550.

In *Darcy* v. *Loew's, Inc.,* there was a definite finding by the workmen's compensation board that "the payment into the household made by the decedent did no more than cover the cost of his own board and lodging, and did not constitute a contribution toward the support of the family." The court reluctantly affirmed the board's decision, stating: "We think that under the circumstances in this case *the Board might well have decided this question of fact the other way,* but we must accept the fact that it did not. Dependency is ordinarily a question of fact, and is clearly so in this case. We may not say as a matter of law that the decision of the Board is without evidence to support it." (Emphasis supplied.)

Neither in *Orosky* v. *American Window Glass Co.* nor in *Hoehn's Case* was there a finding that the child's share of the family living expenses exceeded his contribution. In the *Orosky* case, there was evidence that the father of the deceased minor son earned $945.35 during the first four months of the year in which the son died and $3,113.42 the year before. The total basic annual expense of the family was $1,247. The board denied the claim of the parents. The case is simply one in which actual dependency did not exist because the father earned more than enough to pay all of the surviving family's living expenses. *Hoehn's Case* involved a similar situation. There, the father earned $75 to $77 per week and the mother earned $42 per week. The father owned two automobiles which were apparently used for pleasure. Upon such facts, the court held that the parents failed to prove that they were "wholly or partially dependent upon the earnings of the employee for support at the time of the injury," as required by the statute.

Claimants contend that the court erred in terminating the payment of the compensation on the 20th anniversary of Clara's birth. Their position is that dependency is determined as of the date of injury of the deceased and that, once there has been a determination of dependency as of such date, the dependency continues until there is proof that actual dependency no longer exists. We agree with claimants.

Under R.L.H. 1945 § 4412, the "relation of dependency must exist at the time of the injury" and parents are entitled to compensation "during the continuation of a condition of actual dependency." In this case, there is a continuation of a condition of actual dependency on the part of claimants so long as they are dependent upon the compensation to maintain themselves and their minor children at the standard of living to which they were accustomed at the time of Clara's injury. The payment of the compensation may be terminated upon proof that the compensation is no longer necessary for the maintenance of claimants and their minor children at such standard of living. The circuit court erred in terminating the payment of the compensation without such proof.

The circuit court found that Clara's average weekly wages were $5.46 by dividing $283.84, her total earnings during the 12 months immediately preceding her injury, by 52, the number of weeks in the year. Claimants and Industrial Accident Board of the County of Kauai contend that Clara's average weekly wages were $46.54. That figure is derived by applying Workmen's Compensation Bureau Rule VII-3A(1) to a daily wage earner, who works 8 hours per day, 5½ days per week and 50 weeks per year, at the wage rate of $1.10 per hour. The rule reads as follows:

"If the employee is a daily wage earner, defined as 'any employee to whom no wages are paid for holidays on which there is no work,' who works six days per week, find the average cash weekly wage as follows:

Daily wage × 300 ÷ 52 = Average cash weekly wage. If the employee works less than six days per week, find his average cash weekly wage on the basis of six-day employment, divide by six, and multiply by the number of days worked. If an employee works seven days per week, find the average cash weekly wage by multiplying the actual cash daily wage by seven."

The rule was made and promulgated by the commission on labor and industrial relations pursuant to R.L.H. 1945, § 4432. It has the force and effect of law to the extent that it is not inconsistent with R.L.H. 1945, Ch. 77. It is not inconsistent with the chapter, and more specifically R.L.H. 1945, § 4419, hereafter referred to as section 4419, in computing the average weekly wages of a daily wage earner to whom work is available for a set number of days per week throughout the year, except in weeks when there are holidays. It is inconsistent with section 4419, if it is applied to a seasonal employee to whom work is available only a part of the year.

Section 4419 provides the statutory basis for the determination of average weekly wages. The language of the section has remained unchanged since the original enactment of our workmen's compensation law in 1915. Its meaning may best be understood if its historical background is considered.

In the original enactment of the workmen's compensation law, our legislature followed the model act approved by the National

Conference of Commissioners of Uniform State Laws in 1910 and withdrawn by the same body in 1930. Only two other jurisdictions followed the model act before its withdrawal, Vermont in 1915 and Idaho in 1917. (Senate Journal 1915, p. 387; 9 Uniform Laws Annotated, Table III, p. xix; 1 Larson's Workmen's Compensation Law, § 5.20.) Thus, originally, the workmen's compensation laws of Vermont and Idaho contained a provision for the determination of average weekly wages, which was identical, word for word, with section 4419.

On the provision for the determination of average weekly wages, the model act followed Schedule I, section 2 (a), of the British Workmen's Compensation Act, 1906 (6 Edw. VII, c. 58). We quote below the provisions of the British act and the model act for comparison, italicizing the significant difference between the two.

The British act provided:

> "For the purposes of the provisions of this schedule, relating to 'earnings' and 'average weekly earnings' of a workman, the following rules shall be observed:—(a) average weekly earnings shall be computed in such manner as is best calculated to give the *rate per week at which the workman was being remunerated*. Provided that where by reason of the shortness of the time during which the workman has been in the employment of his employer, or the casual nature of the employment, or the terms of the employment, it is impracticable at the date of the accident to compute the rate of remuneration, regard may be had to the average weekly amount which, during the twelve months previous to the accident, was being earned by a person in the same grade employed at the same work by the same employer, or, if there is no person so employed, by a person in the same grade employed in the same class of employment and in the same district * * *." ([1908] 1 K.B. 442, note.)

The provision of the model act, incorporated in section 4419, was as follows:

> "Average weekly wages shall be computed in such a manner as is best calculated to give the *average weekly earnings of the*

*workman during the twelve months preceding his injury;* provided, that where, by reason of the shortness of the time during which the workman has been in the employment, or the casual nature of the employment, or the terms of the employment, it is impracticable to compute the rate of remuneration, regard may be had to the average weekly earnings, which, during the twelve months previous to the injury, were being earned by a person in the same grade employed at the same work by the employer of the injured workman, or if there is no person so employed, by a person in the same grade employed in the same class of employment and in the same district."

The significance of the indicated difference between the two will be adverted to later.

The provision of the British act was construed in *Bailey* v. *G. H. Kenworthy, Limited,* [1908] 1 K.B. 441, and *Anslow* v. *Cannock Chase Colliery Company, Limited,* [1909] 1 K.B. 352, affirmed, [1909] A.C. 435. Both cases were decided before the conference approved the model act. They established a rule expressed in the following formula:

$$\frac{\text{Weeks of work available}}{52} \times \frac{\text{Wages earned}}{\text{Weeks worked}} =$$

Average Weekly Wages

In that formula:

(a) "Weeks of work available" is the number of weeks in which work was available during the period of 12 months preceding the accident.

(b) 52 is the number of weeks in the 12-month period.

(c) "Wages earned" is the amount earned in the 12-month period.

(d) "Weeks worked" is the number of weeks actually worked in the 12-month period.

Where the number of weeks in which work was available and the number of weeks actually worked are same, the average weekly wages are computed simply by dividing the wages earned by 52.

The rationale of the rule was stated as follows by Fletcher Moulton, L. J., in *Bailey* v. *G. H. Kenworthy, Limited,* when the case was before the Court of Appeal: "I will assume, for the sake of clearness, that the total of the stoppages from recognized holidays amount to two weeks, and that the remainder of the interruptions from accidents and other causes amount to one week. It appears to me that the right method of proceeding is to say that the sum total of the earnings, namely, 83*l*. 2*s*. 1*d*., was earned by forty-nine weeks' work, and the average per week thus obtained will give the average wages earned in a week of full work. But there are only fifty weeks of full work in the year, and therefore the average earnings in a week would be less than the figure so obtained by one twenty-sixth part, or about 4 per cent. In other words, the earnings in a week of full work are to that extent higher than the average weekly earnings in the employment, because there is incident to it an enforced idleness of two weeks in the year. The week during which the workman was absent from work on account of breakdown in the works stands in a different position. If such interruptions were a normal and recognized incident, I should consider that they might be treated in the same way as the stoppages with which I have just dealt. Otherwise I should consider that accidental interruptions of that kind ought not to be considered as affecting the rate of remuneration which the workman was receiving." That case involved an employee of a cotton mill, who earned 83*l*. 2*s*. 1*d*. by working 49 weeks during the period of 12 months preceding his injury. He did not work the other 3 weeks because no work was available. In 2 of the 3 weeks no work was available because of recognized holidays. In the remaining week the mill was shut down by accident.

In the *Anslow* case, the employee worked 33 weeks during the period of 12 months preceding his injury and earned 68*l*. 4*s*. 9*d*. In the other 19 weeks, he did not work for the following reasons: 14 weeks because the trade was not brisk enough to provide employment; 2 weeks because of public holidays; 2 weeks because of his illness; and 1 week because he took a rest. The county court judge followed the opinion of the lord justice in the *Bailey* case in computing the amount of the award. The award was appealed to

the Court of Appeal and then to the House of Lords. In affirming the award, Lord Loreburn, L. C., for the House of Lords, stated: "The object of the Act broadly stated is to compensate a workman for his loss of capacity to earn, which is to be measured by what he can earn in the employment in which he is, under the conditions prevailing therein, before and up to the time of the accident. If he takes a holiday and forfeits his wages for a month, then that does not interfere with what he can earn. It is only that for a month he did not choose to earn. So, too, if there be a casualty accidentally stopping the work. But if it is part of the employment to stop for a month in each year, then he cannot earn wages in that time in that employment, and his capacity to earn is less, over the year."

The manner in which the English rule operates may be illustrated by the following example: Assume that the injured employee worked in a factory which operates only 40 weeks in a year and stops work in the other 12 weeks as a normal and recognized incident of its operation; that he was sick for 5 of the 40 weeks in the period of 12 months before his injury and worked only 35 weeks; and that he earned $1,750 in the 35 weeks that he worked. His average weekly earnings for the 35 weeks that he worked would be $1,750 divided by 35, or $50. If he had worked the full 40 weeks in which work was available, he would have earned $50 times 40, or $2,000. His average weekly earnings under the rule would be $2,000, divided by 52, or $38.46.

What the English rule does is to average over 52 weeks the wages that the injured employee could have earned in his employment during the period of 12 months previous to the accident, upon giving due consideration to interruptions on account of normal and recognized incidents of employment but not interruptions on account of personal reasons. Interruptions of work due to normal and recognized incidents of employment are taken into consideration because they are expected to occur year after year and limit the availability of work. Interruptions due to causes that were personal to the employee are ignored because they are not expected to be recurrent and affect only his availability. The objective of wage calculation in workmen's compensation law is to arrive at a fair approximation of the employee's future earning capacity.

(2 Larson's Workmen's Compensation Law, § 60.11; *Morrison-Merrill & Co.* v. *Industrial Commission,* 81 Utah 363, 18 P. [2d] 295.) In arriving at such approximation, availability of work is a basic consideration. Even if the employee is ready, able and willing to work, it cannot be said that he will suffer any loss of earnings unless work is available. In disregarding factors that are personal to the employee, the assumption is that he will normally work whenever work is available.

Presumably, the conference was aware of *Bailey* v. *G. H. Kenworthy, Limited,* and *Anslow* v. *Cannock Chase Colliery Company, Limited,* when it approved the draft of the model act. It will be noted that in the British act, the phrase "during the twelve months previous to the accident" did not appear in the first sentence of Schedule I, section 2 (a); it only appeared in the proviso. So, in the *Anslow* case, counsel for the employee argued in the Court of Appeal that "According to Sched. I (2) (a) the weekly earnings are to be computed so as to give the 'rate per week' at which the workman was being remunerated; the test therefore is, not what the man has earned in any twelve months, but what was he able to earn per week." In the model act, the phrase "during the twelve months preceding his injury" was inserted both in the mandatory portion, as well as in the proviso, of the section for the determination of average weekly wages. We think that the insertion of the phrase in the mandatory portion of the section of the model act is significant as an obvious measure to forestall such argument as was made in the *Anslow* case.

In Vermont, the legislature amended the section for the determination of average weekly wages by substituting the phrase "during the twelve weeks preceding his injury" for the phrase "during the twelve months preceding his injury." The amendment was made in 1919, four years after the original enactment of the law. *San Martin* v. *Rock & Sons Co.,* 106 Vt. 301, 172 A. 635, arose under the section, as amended. The case involved an employee who earned $237.85 in 8 weeks of work during the period of 12 weeks preceding his injury. In the other 4 weeks, he did not work because the employer did not have enough work to keep all of its men busy.

The court followed the English cases and computed the average weekly wages by dividing $237.85 by 12.

The Supreme Court of Idaho also followed the English cases in *Sugars* v. *Ohio Match Co.*, 53 Idaho 408, 23 P. (2d) 743. In that case, the employer was engaged in logging operations and operated approximately 6 months in each year. The employee earned $779.15 in six months of work. In computing the average weekly wages, the trial court divided $779.15 by 52. On appeal, the supreme court rejected the employee's argument that average weekly wages ought to be computed by dividing the earnings by the number of weeks actually worked, stating: "Appellant's theory of computation, namely, by dividing the earnings of appellant for twelve months prior to his injury by the number of weeks he actually worked, is certainly not such a computation 'as is best calculated to give the average weekly earnings of the workman during the twelve months preceding his injury,' as such computation would result in appellant's average weekly wages during the whole year, including the time he did not work, being practically equal to what he earned while he was actually employed. Such computation is based upon the average weekly earnings during six months and not a year preceding appellant's injury."

*Sugars* v. *Ohio Match Co.* was decided in 1933. Thereafter, in 1935, the Idaho legislature amended the section for the computation of average weekly wages to read as follows:

"Average weekly wages where the workman has worked substantially every week in the year, shall be computed in such a manner as is best calculated to give the average weekly earnings of the workman during the 12 months preceding his injury; provided, that where by reason of the shortness of the time during which the workman has been in the employment, it is impracticable to compute the rate of remuneration, regard may be had to the average weekly earnings which, during the 12 months previous to the injury, were being earned by a person in the same grade employed at the same work by the employer of the injured workman, where the industry is carried on substantially the whole year; provided further that where the business of the employer is not carried on substantially the whole year, the daily

wages the workman was earning at the time of his accident shall be multiplied by the number of days a week he was working subject to a minimum of four. If a workman at the time of the injury is regularly employed in a higher grade than formerly during the year and with larger, regular wages, only such larger wages shall be taken into consideration in computing his average weekly wages."

In 1951, the Idaho legislature further amended the section to read as follows:

"Average weekly wages as the basis for computing compensation shall be the weekly wages paid or payable to the employee at the time of the accident, but not less than 36 times the hourly rate of pay or not less than 4½ times the daily rate, whichever is more applicable under the contract of hiring. When circumstances are such that the actual rate of pay cannot be readily ascertained, the wage shall be deemed to be the contractual, customary or usual wage in the particular employment, industry or community for the same or similar service."

We are constrained to follow the English cases in construing section 4419, in view of the language of the section and its historical background. Claimants argue that such construction will bring about results that are contrary to contemporary notion of social justice. We are inclined to agree. But the workmen's compensation law is a creature of the legislature. Our function is to construe the statutory language. The workmen's compensation law is to be liberally construed. (*Wong Chee* v. *Yee Wo Chan,* 26 Haw. 785, 794.) Nevertheless, in the exercise of our function, we may not inject our idea of what is socially desirable under the guise of liberal construction, when there is no warrant for doing so in the statutory language. As in the case of the Idaho statute, the remedy is with the legislature.

In Utah also, the legislature amended the statute after the court construed it in a manner not to its liking. Originally, the statute did not furnish much of a guide to the determination of average weekly wages. Compiled Laws 1917, § 3142, merely provided:

"The average weekly wage of the injured person at the time of the injury shall be taken as the basis upon which to compute the benefits." *State Road Commission* v. *Industrial Commission,* 56 Utah 252, 190 P. 544, arose under that statute. It involved an employee who earned $91.50 in 31 weeks of intermittent work. The court divided $91.50 by 31 and held that the average weekly wages were $2.95, stating: "If the workman is employed at irregular intervals or at irregular amounts, the wage is determined by dividing the aggregate by the number of weeks. * * * The number of weeks covered by the intermittent employment was 31. The total amount earned was $91.50. This amount divided by 31 gives the sum of $2.95 as the average weekly wage. The fact will be noted that this method of computation takes into consideration not only the weeks in which he did some work, but also the weeks he did not work at all. This we conceive to be the spirit and meaning of the statute." After the decision, the statute was amended by Laws of Utah 1921, Ch. 67, to provide as follows:

"Sec. 3142. The average weekly wage of the injured person at the time of the injury shall be taken as the basis upon which to compute the benefits, and shall be arrived at and determined in the following manner, to wit: * * *

"3. Determine daily wage as follows:

* * *

"(d) If the wage is on an hourly basis, multiply pay per hour by the number of hours said employment regularly operates, or if operation is not regular, use eight hours as a day.

* * *

"5. To determine weekly compensation, let D represent daily wage.

"If 5½ or 6 days of employment per week—

$$\frac{D \times 300 \times .60}{52} = \text{weekly compensation."}$$

In applying the amended statute in *Morrison-Merrill & Co.* v. *Industrial Commission, supra,* the court stated: "An examination of various workmen's compensation acts shows that in many juris-

dictions the method of computing compensation to be paid an injured employee, or in case of death to his dependents, is similar to that which prevailed in this jurisdiction before the amendment of 1921. It is apparent, however, that the lawmaking power of this state was dissatisfied with the method of computing compensation which prevailed prior to 1921, and hence in the amendment of that year it prescribed a rule for computing compensation. That it was competent for the Legislature to prescribe a rule for computing compensation to be paid injured employees is not open to question. Nor may it be said that the method of computing compensation adopted by the lawmaking power in the amendment of 1921 is without reason to support it. The loss which an injured employee sustains because of an injury which incapacitates him from work is measured by what he would have earned during the period of his disability rather than by what he actually earned during a given period prior to his injury. The amount earned by an employee who worked intermittently prior to his injury may or may not be a fair index of what he would have earned in the future during a period of disability which may continue for six years, or, in the event the injury results in permanent disability, for life. It may be that the Legislature intended that the injured employee who, prior to the time of his injury, was unable to secure continuous employment, should be compensated on a basis of loss of earning power rather than on the basis of what he had earned during a given period before he was injured. Those and similar questions are proper subject-matters of inquiry by the lawmaking power for its guidance, but the duty of the commission and of this court is confined to ascertaining the intention of the Legislature as expressed in its enactments and to give such intention effect."

In the instant case evidence is undisputed that Clara was a seasonal employee, that she earned $283.84 during the period of 12 months preceding her injury, and that the employer had seasonal work available during the peak season. There is no evidence that Clara entered the labor market as a regular employee. Her failure to work in the first 9 of the 12 months preceding her injury was due to the seasonal nature of her employment. There is no evidence as to the exact duration of the peak season in 1955. However,

there is evidence that normally a peak season in the cannery begins before July 1 and continues for a period of 14 consecutive weeks or less and that a peak season in the field may start 1 or 2 weeks later and continue for a like period, so that the maximum duration of a peak season both in the cannery and the field does not exceed 16 weeks. The evidence is that Clara earned the $283.84 over a period of 13 weeks, but there is no evidence as to the number of weeks that she worked in that period. It appears that she did not work in every week in August because during that month she earned only $34.10.

For the application of the formula established by the English cases, it is necessary to have evidence as to the number of weeks in which work was available to seasonal workers during the period of 12 months preceding her injury and as to the number of weeks that she actually worked in earning $283.84. There is no such evidence. However, we do not think that it is necessary to remand the case for further trial in order to obtain such evidence, for we do not think that the most favorable evidence that claimants can possibly adduce will bring Clara's average weekly wages up to $27.00.

Under the evidence, the maximum number of weeks in which seasonal work was available, both in the cannery and the field, during the period of 12 months preceding Clara's injury would not have exceeded 16 weeks. Clara could not have earned the $283.84 in less than 7 weeks (3 weeks in July, 1 week in August, and 3 weeks in September), assuming that she worked at the rate of $1.10 per hour, and not more than 8 hours per day and 5½ days per week. If we assume that the number of weeks in which seasonal work was available was 16 and that Clara earned the $283.84 in 7 weeks, then Clara's average weekly wages would have been 16/52 × $283.84/7, or $12.48. If we assume that the season began on July 1 and ended on the last day in September, a period of 13 weeks, and that Clara earned the $283.84 in 13 weeks, then her average weekly wages would have been $5.46, the amount obtained by the circuit judge by dividing $283.84 by 52.

The formula is not contrary to *Forrest* v. *Davies & Co.,* 37 Haw. 517. This court stated in that case, at page 527: "It is not necessary that the employment history of the injured workman cover an

antecedent period of twelve months. It is only necessary that his employment history be of sufficient duration to admit of the computation of his average weekly wages on an annual basis. By computing upon an annual basis due allowance is made for the difference in wages accruing during the course of twelve months as a result of seasonal differences in both the opportunity for and the ability to accept work."

Nor is the formula contrary to Workmen's Compensation Bureau Rule VII 3A(1). That rule applies to regular employees, paid on daily basis, who lose two weeks of work in a year on account of holidays as a normal and recognized incident of employment. As to such employees, the formula achieves the same result as the rule. For instance, if Clara were a regular employee, and had worked for $1.10 per hour, 8 hours per full day, 4 hours per half day, and 5½ days per week in every week during the period of 12 months preceding her injury, except in weeks in which there were holidays, she would have earned $8.80 per day, $48.40 per week, and $2420 for 50 weeks. Her annual earnings would be represented by 50 weeks of work because she would have lost 2 weeks on account of holidays. Her average weekly earnings would then be 50/52 × $2420/50, or $46.54, the precise amount obtained by applying the rule. But Rule VII-3A(1) did not apply to Clara because she was not a regular employee.

The judgment of the circuit court is affirmed insofar as it orders the employer to pay to claimants a weekly compensation of $6.75, beginning September 29, 1955; it is reversed insofar as it terminates the payment of the compensation on the 20th anniversary of Clara's birth. Remanded with direction to enter an amended judgment in accordance with this opinion.

*R. M. Torkildson* and *F. W. Rohlfing* (*Moore, Torkildson & Rice* with them on the briefs) for Hawaiian Canneries Company, Ltd.

*James A. King* (*Bouslog & Symonds* with him on the briefs) for dependents-claimants Robert and Lei Kali.

*W. K. Watkins, Jr.,* Deputy Attorney General (also on the briefs) for Industrial Accident Board of the County of Kauai, Territory of Hawaii.

OPINION OF STAINBACK, J.
(Concurring in Part and Dissenting in Part.)

I concur in the conclusion of the majority herein that the parents were partially dependent upon the deceased and are entitled to compensation during the continuation of the condition of actual dependency. The court below in limiting such compensation to a period which would include only the minority of the deceased, were she living, has confused the rule for damages in a tort action for a parent's loss of services of a minor with the rule relative to workmen's compensation awards which are not based on tort.

While dissenting opinions as a rule serve no useful purpose, I must briefly express my disagreement in this case with the majority in the method of computing average weekly wages. Section 4419, Revised Laws of Hawaii 1945, provides:

"Average weekly wages shall be computed in such a manner as is best calculated to give the average weekly earnings of the workman during the twelve months preceding his injury; provided, that where, by reason of the shortness of the time during which the workman has been in the employment, or the casual nature of the employment, or the terms of the employment, *it is impracticable to compute the rate of remuneration,* regard *may* be had to the average weekly earnings, which, during the twelve months previous to the injury, were being earned by a person in the same grade employed at the same work by the employer of the injured workman, or if there is no person so employed, by a person in the same grade employed in the same class of employment and in the same district." (Emphasis added.)

Looking at the purpose of the Act, it would not seem a strained construction to hold that the average for the 12 months preceding refers to a workman who has worked throughout the year and not one who has worked only 3 months prior to the injury. This is given emphasis by the fact of the words "by reason of the shortness of the time during which the workman has been in the employment" regard *may* be had to the average weekly earnings of persons in the same grade employed at the same work, and so employed for a period of 12 months and not 3 months. Otherwise,

STAINBACK, J., concurring in part and dissenting in part.

there would be no purpose in adding the comparison of other workers, just take the employee's total wages for the period employed and divide by 52 or 50 as the rule may be.

Workmen's compensation looks to the future rather than to the past and the only purpose in looking at past wages is to judge the loss of earning power of the workman on the basis of what he had earned during a given period before he was injured. The weekly average is hardly a "weekly average" if 3 months employment is averaged on a 12 months basis.

As stated in *Forrest* v. *Davies & Co.*, 37 Haw. 517, at 526:

"No statutory formulae are prescribed for the computation of average weekly wages. The only statutory provisions on the subject of computation of average weekly wages are those found in section 4419, supplemented by the definition of 'wages' contained in section 4401. But the provisions of section 4419 negative the legislative imposition of any preconceived formulae for computing average weekly wages. The use of the word 'manner' and the *permissive phrase* 'regard *may* be had' indicate that whatever methods or formulae are to be applied *is committed to the sound discretion* of the administrative officer, board or court having the matter of computation in hand * * *.

"In our opinion, the provisions of section 4419 are merely *guides* to computing average weekly wages accordingly as the injured workman has an employment history sufficient from a practical standpoint (arithmetical perfection not being required) to compute his average weekly wages when the enacting clause of the section applies or where, by reason of shortness of time or the casual nature of the employment or by reason of the terms of the employment, it is impracticable to compute the rate of remuneration when the proviso of the section applies.

"*It is not necessary that the employment history of the injured workman cover an antecedent period of twelve months. It is only necessary that his employment history be of sufficient duration to admit of the computation of his average weekly wages on an annual basis.*" (Emphasis added.)

It is undisputed that Clara was employed by the employer in 1955 for the summer months of July, August and September only. Consequently, there is no basis for the court's conclusion that Clara had "an 'employment history' * * * extending over a twelve-month period prior to her injury."

The director's determination of the amount of the decedent's average weekly wage was in conformity with the construction that had been uniformly given to section 4419 in similar administrative decisions during the past 14 years and should have been accepted by the court as being within the "sound discretion of the administrative officer." (*Forrest* v. *Davies, supra.*)

The rule of law regarding the weight to be accorded administrative construction and interpretation is stated in *Ewa Plantation* v. *Wilder,* 26 Haw. 299, 316, affirmed 289 Fed. 664:

"The rule is that the contemporaneous construction of a statute by those charged with its execution, especially when it has long prevailed, is to be regarded as a legitimate aid to statutory construction and is entitled to most respectful consideration and should not be disregarded or overturned except for cogent reasons."

See also 82 C. J. S., *Statutes,* section 359, page 786.

The method of computing the wages as adopted by the director and the board and followed for many years is not so illogical as to be disregarded by the trial judge, particularly as the legislature had not seen fit to make any change in such method.

The interpretation in the case before us, involving as it does only a partial dependency of the parents, is not so shocking as it might have been if, for example, Clara had been permanently injured such as losing an eye or a limb and her compensation had been based upon this weekly wage of $5.45. It is difficult to believe the legislature intended compensation to be based upon such figures.

If this interpretation given the statute by the majority opinion is correct, the numerous temporary employees of the various canneries face a situation which should promptly be remedied by legislation. However, the amount of compensation and the methods upon which it is to be arrived at, are matters for legislative discretion.